# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

---------------------------------------------------------------X

| | | |
|---|---|---|
| JOHN DOE, | : | Civil Action No.:19-cv-12577 |
| | : | |
| **Plaintiff,** | : | |
| | : | **COMPLAINT** |
| v. | : | |
| | : | |
| THE TRUSTEES OF PRINCETON | : | |
| UNIVERSITY, TIGER INN, | : | |
| MICHELE MINTER, | : | |
| REGAN HUNT CROTTY, JOYCE CHEN | : | |
| SHUEH, and EDWARD WHITE, | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

---------------------------------------------------------------X

Plaintiff John Doe[1] ("Plaintiff" or "Doe"), by his attorneys Nesenoff & Miltenberg, LLP, as and for his complaint against Defendants The Trustees of Princeton University ("Princeton" or "the University"), Tiger Inn ("TI"), Michele Minter ("Minter"), Regan Hunt Crotty ("Crotty"), Joyce Chen Shueh ("Shueh"), and Edward White ("White") (collectively, "the individual defendants" and collectively with Princeton and TI, "Defendants"), respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.      Plaintiff John Doe, a sophomore at Princeton University at all times relevant herein, was sexually harassed at Tiger Inn ("TI")—one of Princeton's "eating clubs"[2]—and was

---

[1] Plaintiff has filed herewith a motion to proceed by pseudonym.

[2] Princeton's "eating clubs" are essentially co-ed fraternities.  According to the Princeton University website, "In the early years, the University did not provide students with dining facilities, so students created their own clubs to provide comfortable houses for dining and social life. Eating clubs are . . . the most popular dining and social option for students in their junior and senior years."

sexually assaulted by one of the older club members on his "initiation" night.

2.     When Plaintiff reported the hazing, harassment, and assault he was subjected to at TI, Princeton took no genuine action to investigate his claims or to hold TI or its officers accountable for numerous reported violations of Princeton's code of conduct.

3.     The Tiger Inn is a notoriously wild, heavy-drinking club, often referred to as "Princeton's 'Animal House,'" with a long, well-documented history of problems with alcohol abuse, hazing, sexual harassment, and sexual misconduct.  In 2014, the words "RAPE HAVEN" were spray-painted on the outer walls of the club, after a TI officer allegedly circulated to the entire club membership photos of a potential sexual assault that happened at a TI party.

4.     Princeton University is well aware of TI's reputation and ongoing issues, yet has intentionally kept a hands-off approach with TI and the rest of the eating clubs, disclaiming responsibility for the rampant abuse that takes place at the clubs by virtue of their allegedly independent status, while providing financial and administrative support to the clubs, which cater exclusively to Princeton students and alumni.

5.     Plaintiff, a sophomore "bickeree"[3] of the Tiger Inn, was directed at his initiation night to binge drink alcohol provided by TI, strip off his clothes, and follow the orders of all upperclassmen, even if it gets "weird."  He was told not to bring any camera, as photos and videos of initiations were strictly forbidden.  He was also slapped, flashed, had cups of beer thrown on him, and was directed to run a "naked lap" around the building, in February, as part of the initiation.

6.     At the end of his initiation night, while Plaintiff was highly intoxicated and still in

_____

[3]  The competitive application process to Princeton's eating clubs (much like the rush/pledge process in fraternities) is known as "bicker," with applicants referred to as "bickerees."

his underwear, he was approached by a TI upperclassman and student athlete who was several inches taller than him.   The TI upperclassman waited until Plaintiff was dancing alone, approached Plaintiff, kissed him, and then directed Plaintiff to find his pants and prepare to leave the club.  Plaintiff obliged, as he had been told to do whatever the upperclassmen said.

7.      The TI upperclassman then took Plaintiff by the hand and led him to a dorm room.   On the way, the upperclassman told Plaintiff numerous specific details that the upperclassman knew about Plaintiff's family, background, and interests, which the upperclassman apparently learned from the bicker process.  Plaintiff had never spoken to the upperclassman before.  The upperclassman also took credit for voting Plaintiff into the club.

8.      Once the two arrived at the upperclassman's private dorm room, they engaged in sexual activity that was directed, initiated, and controlled by the upperclassman.  Plaintiff was drunk and extremely uncomfortable, but felt he had to acquiesce or else he would jeopardize his spot in the eating club.  After a few hours of sexual activity, Plaintiff eventually left and returned to his own dorm.

9.      A few weeks after Plaintiff's initiation, the upperclassman—Jane Roe[4]—filed a Title IX complaint against Plaintiff, alleging that some (but not all) of their sexual activity was nonconsensual.  Plaintiff filed a cross-complaint, alleging that it was Roe who had assaulted him, as he had been extremely drunk and coerced by virtue of the TI initiations process and Roe's position of power at TI and her physical stature.

10.     This case arises out of the biased, unlawful, and improper actions and inactions of Princeton University in knowingly, willfully ignoring Plaintiff's reports of harassment and hazing, and sloppily investigating and wrongly adjudicating false allegations made against

---

[4] Jane Roe is a pseudonym.

Plaintiff by his own abuser, alleging nonconsensual sexual activity in violation of Princeton's Sexual Discrimination and Sexual Misconduct Policy (the "Policy").

11.     Throughout the Title IX investigation into the interaction between Plaintiff and Roe, Princeton's Title IX panel patently and deliberately failed to address Plaintiff's reports of numerous conduct code violations, abuse, and harassment he was subjected to at TI initiations, including that TI's older members had coerced the largely-underage bickerees, including Plaintiff, into consuming mass quantities of alcohol, which TI provided, and taking off their clothes, while repeatedly priming them to do whatever the upperclassmen said.

12.     Princeton also ignored certain activities that seriously called into question Roe's credibility, and subjected Plaintiff to a highly prejudicial, unfair, and inadequate investigatory and adjudicatory process.

13.     Eventually, Plaintiff was found responsible for sexual assault against Jane Roe, and sanctioned with a two-year suspension, while Roe was found not responsible for sexual assault for taking the highly inebriated, younger, and physically smaller Plaintiff back to her room on initiation night.

14.     On information and belief, Princeton took no action with respect to TI and its initiation hazing, including providing alcohol to underage students and instructing them to strip down to their underwear and obey all upperclassmen.

15.     Princeton's disciplinary process was riddled with procedural and substantive errors, including: Failure to conduct a fair, equitable, impartial investigation; failure to properly apply the preponderance of the evidence as the burden of proof; failure to accord Plaintiff a presumption of innocence; failure to provide Plaintiff with all of the evidence against him, including witness identities; and abuse of discretion in the issuance of an unduly harsh and

4

unwarranted sanction.  In sum, Princeton's process was geared toward a predetermined finding of Plaintiff's guilt as the male accused, and evidenced selective enforcement of Princeton's Title IX policies and a blatant, deliberate indifference to the harassment to which Plaintiff was exposed at TI initiations.

16.     Indeed, Princeton undertook no genuine efforts to investigate claims that TI upperclassmen: (i) told bickerees to strip down to their underwear; (ii) provided alcohol to underage bickerees, including handing them cups of beer and telling them to "chug"; (iii) slapped and threw beer on bickerees; (iv) told bickerees to strip further and run a "naked lap" around the club, outside, in February; and (v) repeatedly flashed their genitals at bickerees. Most disturbingly, Princeton made no investigation into TI's directions to their bickerees that no cameras or recording devices were to be brought to initiation night.

17.     By employing gender-based, pre-determined presumptions of Plaintiff's guilt from the outset, and by imposing an unreasonable sanction, and by selectively enforcing the Policy as between similarly situated male and female students, Princeton displayed anti-male discriminatory bias, leading to an erroneous outcome and selective enforcement in violation of Title IX of the Education Amendments of 1972 and New Jersey's Law Against Discrimination (LAD).

18.     By refusing to investigate Plaintiff's reports of hazing and sexual harassment at a club that has a long, well-known history of sexual harassment, Princeton was deliberately indifferent to student-on-student harassment, in violation of Title IX of the Education Amendments of 1972.

19.     By violating its own policies and depriving Plaintiff of a fair and impartial disciplinary process, Princeton breached express and implied agreements with Plaintiff and acted

in bad faith in failing to fulfill its promises to him as an enrolled student paying tuition at Princeton.

20.     By engaging in a biased, flawed, and deficient investigation and disciplinary process, the finding and sanction were arbitrary, capricious, unreasonable, fundamentally unfair, and not supported by sufficient credible evidence.

21.     As a result of Princeton's discriminatory and unlawful conduct, Plaintiff has sustained damages, including but not limited to past and future economic losses, reputational harm, and diminished educational and career prospects.

22.     Accordingly, Plaintiff brings this action to obtain monetary and injunctive relief.

## THE PARTIES

1.     Plaintiff John Doe is a natural person, a citizen of Liberia and the United States and resident of the State of New Jersey.  At all relevant times herein, Plaintiff was an enrolled undergraduate student at Princeton University with an expected graduation date of May 2020.

23.     Defendant Princeton University is a partially federally funded, private university located in Princeton, New Jersey, where it maintains its principal offices and place of business.

24.     On information and belief, Defendant Tiger Inn is a "self-owned" club that is "governed and operated by undergraduate officers" consisting of Princeton students, and a graduate board consisting of Princeton alumni.  Tiger Inn is located in Princeton, New Jersey.

25.     Defendant Michele Minter is a natural person and, at all times relevant herein, was the Vice Provost for Institutional Equity and Diversity at Princeton.  On information and belief, Minter is a resident of New Jersey.

26.     Defendant Regan Hunt Crotty is a natural person and, at all relevant times herein,

was the Director of Title IX Administration at Princeton.  Defendant Crotty served as a member

of the three-person panel assigned to investigate and adjudicate Plaintiff and Roe's cross-claims,

and Smith's claims against Plaintiff (the "Title IX Panel" or "Panel").  On information and

belief, Crotty is a resident of New Jersey.

27.     Defendant Joyce Chen Shueh is a natural person and, at all relevant times herein,

was the Senior Associate Dean of Undergraduate Studies at Princeton.  Defendant Shueh served

as a member of the Title IX Panel.  On information and belief, Shueh is a resident of New

Jersey.

28.     Defendant Edward White is a natural person and, at all relevant times herein, was

a Title IX Investigator at Princeton.  White served as a member of the the Title IX Panel.  On

information and belief, White is a resident of New Jersey.


## JURISDICTION AND VENUE

29.     This Court has Federal question and supplemental jurisdiction pursuant to

28 U.S.C. § 1331 and 28 U.S.C. § 1367, because: (i) the claims arise under the constitution and

statutes of the United States; and (ii) the state law claims are so closely related to the federal

law claims as to form the same case or controversy under Article III of the U.S. Constitution.

30.     This Court has personal jurisdiction over Princeton University and Tiger Inn

because they are located and conduct business within the State of New Jersey.

31.     This Court has jurisdiction over the individual defendants because they were

employed by Princeton and conducted business in New Jersey at all times relevant herein, and,

upon information and belief, reside within the state of New Jersey.

32.     Venue for this action properly lies in this district pursuant to 28 U.S.C.

§ 1391 because the acts or omissions giving rise to Plaintiff's claims occurred in this judicial district.

<strong><u>FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS</u></strong>

**I.    BACKGROUND: PRINCETON IS PRESSURED INTO PROSECUTING MEN.**

> **A.    <u>The April 2011 "Dear Colleague Letter": The Office for Civil Rights Places Pressure on Universities to Aggressively Pursue Sexual Misconduct Complaints.</u>**

33.    On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL").

34.    The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972 and its regulations.

35.    The DCL directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at 4.

36.    The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance. *See* Joseph Shapiro, *Campus Rape Victims: A Struggle for Justice*, National Public Radio (Feb. 24, 2010), http://www.npr.org/templates/story/story.php?storyId=124001493. The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings, and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses, and young men's cultural

adherence to the sexual aggressor role.

37.     The OCR further relied on faulty statistics in sounding its "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college."  DCL at 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study, and warned that it was "inappropriate to use the 1-in-5 number as a baseline . . . when discussing our country's problem with rape and sexual assault on campus." *See* Christopher Krebs and Christine Lindquist, *Setting the Record Straight on "1 in 5,"* Time Magazine (Dec. 14, 2015), http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/.

38.     Relying on the faulty one-in-five statistic, the OCR, through the DCL, minimized due process protections for the accused by, among other things, mandating the adoption of a relatively low burden of proof—"more likely than not"— in cases involving sexual misconduct, expressly prohibiting colleges from applying a higher standard of proof and "strongly discourag[ing]" the use of cross-examination and other crucial methods for testing complainant credibility.

39.     The DCL advised that schools should "minimize the burden on the complainant" and focus on victim advocacy.  For example, it stated that schools should give both parties the right to appeal a decision – in other words, if an accused student was found not responsible, the complainant could then appeal and force the respondent to defend the claims all over again, functionally constituting double-jeopardy.

40.     Despite its purported purpose as a mere guidance letter, the Department of Education treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

41.    On April 19, 2014, the OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* (the "2014 Q&A").

42.    Like the DCL, the 2014 Q&A was aimed at addressing educational institutions' sexual misconduct policies, including the procedures schools "must" have in place "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence."  The 2014 Q&A advised schools to adopt a "trauma-informed" approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." 2014 Q&A at 31.  The Q&A further advised that, although "the rights established under Title IX must be interpreted consistently with any federally guaranteed due process rights … a school should ensure that any due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant."  2014 Q&A at 13 (emphasis added).

43.    In the same month that the OCR issued its 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, prepared by the White House Task Force to Protect Students from Sexual Assault, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), available at https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf.   The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

44.    In June 2014, then-Assistant Secretary of Education Catherine Lhamon testified

before the United States Senate, warning that if the OCR could not secure voluntary compliance with the DCL from a college or university, it could elect to initiate an administrative action to terminate federal funds or refer the case to the Department of Justice.

45.     To support its enforcement of the DCL, the OCR hired hundreds of additional investigators.  To date, OCR has conducted <u>over five hundred</u> investigations of colleges for the potential mishandling of complaints of sexual misconduct--including Princeton, which was the subject of three separate complaints filed in 2010 and 2011.  *See Title IX: Tracking Sexual Assault Investigations*, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited February 1, 2019); OCR Determination Letter to Princeton (Nov. 5, 2014), *available at* https://assets.documentcloud.org/documents/2644774/OCR-Determination-Letter-to-Princeton.pdf.

46.     The threat of revocation of federal funds—the ultimate penalty—was a powerful tool in motivating colleges to aggressively pursue and punish male students accused of sexual misconduct.  In that regard, Anne Neal, of the American Council of Trustees and Alumni, observed:  "There is a certain hysteria in the air on this topic, … It's really a surreal situation, I think." *See* Tovia Smith, *How Campus Sexual Assaults Came to Command New Attention*," National Public Radio (Aug.12, 2014), https://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention.  Neal explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead."

47.     Robert Dana, Dean of Students at the University of Maine, echoed the sentiment that a fear of governmental intervention and withdrawal of funds could lead colleges to rush to judgment against male students in disciplinary proceedings.  *See* Tovia Smith, *Some Accused of*

*Sexual Assault on Campus Say System Works Against Them*, National Public Radio (Sept. 3, 2014), https://www.npr.org/2014/09/03/345312997/some-accused-of-campus-assault-say-the-system-works-against-them.  Dana told NPR, "[c]olleges and universities are getting very jittery about it." *Id.*

48.     Likewise, on September 1, 2014, the Chronicle of Higher Education noted that colleges were facing "increasing pressure from survivors and the federal government," including claims that college campuses had become "hazardous places" for female students.  *See* Robin Wilson, *Presumed Guilty: College Men Accused of Rape Say the Scales are Tipped Against Them*, Chronicle of Higher Education (Sept. 1, 2014), https://www.chronicle.com/article/Presumed-Guilty/148529.  For example, the article noted that different standards were being applied to male students versus female students:  "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no.  That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." *Id.*

49.     Indeed, this precise issue came to a head in a series of events that took place just weeks after this article was published:  In late September 2014, at Miami University, Ohio, a female and male student engaged in various sexual acts while <u>both</u> claimed to be intoxicated; the university subsequently pursued sanctions against the male student, but not against the similarly situated female student.  *See Doe v. Miami Univ.*, 882 F.3d 579, 596 (6th Cir. 2018).  In a decision issued recently in that case, the Sixth Circuit Court of Appeals found the male student sufficiently alleged gender-based unequal treatment as a result of the college's refusal to pursue

disciplinary action against the female student for the same conduct on which it based disciplinary action against plaintiff, the male student.

### B.  The 2017 Revocation of the DCL and Princeton's Refusal to Update its Policies and Procedures.

50.     On September 22, 2017, the OCR rescinded the DCL and put in place interim guidance (the "2017 Q&A"), while the current administration reviews and revises its practices regarding the adjudication of complaints of sexual misconduct on college campuses receiving federal funding. *See* Dep't of Ed*., Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

51.     As Secretary of Education, Betsy DeVos, noted, the rescission of the DCL was largely motivated by "[t]he truth … that the system established by the prior administration has failed too many students," specifically because "[t]he notion that a school must diminish due process rights to better serve the 'victim' only creates more victims."  Press Release, Secretary DeVos Prepared Remarks on Title IX Enforcement (Sept. 7, 2017), available at https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

52.     In rescinding the 2011 DCL, the OCR noted that it had placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness," and "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation."  *Id.* (citations omitted).

53.     In that regard, the 2017 Q&A prohibits universities from relying on fixed rules or assumptions that favor complainants over respondents.

54.     The 2017 Q&A emphasizes the need for equal rights under Title IX proceedings, mandating that "[a]ny rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms."  2017 Q&A at 4.

55.     The 2017 Q&A also directs that "[w]hether or not a student files a complaint of alleged sexual misconduct or otherwise asks the school to take action, where the school knows or reasonably should know of an incident of sexual misconduct, the school must take steps to understand what occurred and to respond appropriately."  2017 Q&A at 1.

56.     The 2017 Q&A requires universities to "adopt and publish grievance procedures that provide for a prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct."  *Id.* at 3 (emphasis added).  In that regard, the "elements in evaluating whether a school's grievance procedures are prompt and equitable[] includ[e] . . . ensur[ing] an adequate, reliable, and impartial investigation of complaints."  *Ibid.*

57.     With respect to investigation, the 2017 Q&A requires "[a] person free of actual or reasonably perceived conflicts of interest and biases for or against any party [to] lead the investigation on behalf of the school."  *Id.* at 4.

58.     The 2017 Q&A also requires investigators to "synthesize all available evidence—including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case."  *Id.* at 4.

59.     As the 2017 Q&A goes on to explain, "[e]ach party should receive written notice in advance of any interview or hearing with sufficient time to prepare for meaningful participation. The investigation should result in a written report summarizing the relevant exculpatory and inculpatory evidence. The reporting and responding parties and appropriate officials must have timely and equal access to any information that will be used during informal and formal disciplinary meetings and hearings."  *Id.* at 6.

60.     The 2017 Q&A further directs that that those issuing sanctions must consider "the impact of separating a student from her or his education," and sanctions should therefore "be

14

proportionate to the violation." *Id.* at 6

61.     The 2017 Q&A suggests that the policies and procedures in place at Princeton at all times relevant to this lawsuit – which were tailored in such a way as to comply with the DCL under the threat of loss of federal funding – were unfair and, ultimately, contrary to the goal of gender equality in Title IX proceedings.

62.      Despite the sweeping changes caused by the rescission of the 2011 DCL and the implementation of the 2017 Q&A, Princeton administrators, including defendant Minter, stated Princeton would not change its policies and procedures.  *See Letter to the Editor: SHARE Statement on Title IX*, The Daily Princetonian (Nov. 15, 2017), http://www.dailyprincetonian.com/article/2017/11/share-title-ix ("Vice Provost Michele Minter, the University Title IX coordinator, affirmed that the University is not making any changes in the short term. 'We believe that our policies are working well,' she said.")

## C.  Princeton's Continued Reliance on an Unfair, Unreliable Process.

63.     In Betsy DeVos's press release preceding the rescission of the DCL, she acknowledged the massive pressure the DCL had improperly placed on universities, stating, "[n]o school or university should deprive any student of his or her ability to pursue their education because the school fears shaming by – or loss of funding from – Washington."  Press Release, *Secretary DeVos Prepared Remarks on Title IX Enforcement* (Sept. 7, 2017), *available at* https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

64.     With respect to the rights of the accused, DeVos declared, "[e]very student accused of sexual misconduct must know that guilt is not predetermined," and that "any school that uses a system biased toward finding a student responsible for sexual misconduct also

commits discrimination." *Id.*  She continued, "Due process is the foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it protects no one."  *Id.*

65.     In November 2018, the Department of Education released its proposed new Title IX regulations.  *See* https://www2.ed.gov/about/offices/list/ocr/docs/title-ix-nprm.pdf.

66.     The proposed regulations expressly disapprove of Princeton's policies and procedures for adjudicating sexual misconduct claims—specifically, the use of one panel (including the Title IX coordinator) to conduct both the investigation and the adjudication (commonly known as the "single-investigator" model):

> Proposed section 106.45(b)(4) would address the process that recipients use to make determinations regarding responsibility, with requirements designed to ensure that recipients make sound and supportable decisions through a process that incorporates appropriate protections for all parties while providing adequate notice of such decisions. *Requiring the decision-maker to be different from any person who served as the Title IX Coordinator or investigator forecloses a recipient from utilizing a "single investigator" or "investigator-only" model for Title IX grievance processes*. The Department believes that fundamental fairness to both parties requires that the intake of a report and formal complaint, the investigation (including party and witness interviews and collection of documentary and other evidence), drafting of an investigative report, and ultimate decision about responsibility should not be left in the hands of a single person. Rather, *after the recipient has conducted its impartial investigation, a separate decision-maker must reach the determination regarding responsibility;* that determination can be made by one or more decision-makers (e.g., a panel), but *no decision-maker can be the same person who served as the Title IX Coordinator or investigator*.

> (emphasis added).

67.     The proposed new regulations would also require the school to provide a live hearing and some form of cross-examination:

> For institutions of higher education, the recipient's grievance procedure *must provide for a live hearing*. At the hearing, the decision-maker *must permit each party to ask the other party and*

*any witnesses all relevant questions and follow-up questions, including those challenging credibility. . . .  At the request of either party, the recipient must provide for cross-examination to occur with the parties located in separate rooms with technology enabling the decision-maker and parties to simultaneously see and hear the party answering questions. The decision-maker must explain to the party's advisor asking cross-examination questions any decision to exclude questions as not relevant. If a party or witness does not submit to cross-examination at the hearing, the decision-maker must not rely on any statement of that party or witness in reaching a determination regarding responsibility.*

(emphasis added).

68.     As one District Court has explained, "[t]he dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review, are obvious.  No matter how well-intentioned, such a person may have preconceptions and biases, may make mistakes, and may reach premature conclusions."  *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 606 (D. Mass. 2016).

69.     Indeed, the Sixth Circuit has firmly established that in disciplinary cases where credibility is at issue, cross-examination is required in order to comport with due process.  *See, e.g.*, *Doe v. Baum*, 903 F.3d 575, 585-586 (6th Cir. 2018).

70.     Despite the imminent changes to Title IX regulations and recent court decisions patently rejecting the same procedures employed by Princeton as fundamentally unfair and vulnerable to abuse, Princeton remains steadfast in its embrace of the biased and unreliable single investigator model.  Princeton has even acknowledged that its current procedures would run considerably afoul of the proposed regulations.  *See* Allie Wenner, *Resetting Title IX*, Princeton Alumni Weekly (Jan. 9, 2019),  https://paw.princeton.edu/article/resetting-title-ix ("Depending on where the final regulations land, we might have to make significant changes.").

D.     **Princeton Faces Years of Complaints for Failure to Address Claims of Sexual Assault and Harassment Allegedly Committed by Male Students and/or Faculty.**

17

71.     Right around the time that the OCR was promulgating and implementing the 2011 DCL, Princeton was under heavy fire for its alleged failure to properly respond to and redress female students' claims of sexual assault and sexual harassment by male students and/or faculty.

72.     On information and belief, in 2010 and 2011, three separate complaints were filed by or on behalf of female students to the OCR, accusing Princeton of insufficiently responding to claims of sexual assault and harassment.   On information and belief, the people accused of assault and/or harassment in all of these cases were male.

73.     In response to the three complaints, OCR launched an extensive, nearly four-year investigation into Princeton's policies and practices in handling sexual misconduct claims, which included student interviews, document and file review, and on-site visits.

74.     On information and belief, as a result of the investigation, OCR concluded that Princeton was in violation of Title IX for failing to adequately respond to and redress the female students' claims of sexual misconduct.

75.     On information and belief, in resolving the OCR complaint, Princeton agreed to, among other things, reimburse the tuition for three female students who had filed complaints.

76.     Princeton also agreed to provide OCR with documentation of its response to and handling of reports of sexual misconduct.

77.     After the 2014 OCR resolution agreement, Princeton was under enormous pressure to respond aggressively to claims of sexual misconduct, specifically misconduct allegedly committed against female students by male students and faculty.

78.     On information and belief, in May 2016, another complaint was filed with OCR alleging Princeton failed to adequately respond to a female student's claims of sexual misconduct by a male.  On information and belief, OCR opened a new investigation at Princeton

in August 2016.  On information and belief, this investigation is still ongoing.

79.     In 2017, Princeton was again in hot water due to an alleged sexual misconduct scandal—this time, between a female graduate student and a male faculty member.  After Princeton initially declined to terminate the faculty member, the female complainant initiated a full-on media blitz and campus movement condemning Princeton's seemingly "lax" response to her harassment claims, which led to numerous student meetings, op-eds, petitions and boycotts, and mass-letter writing campaigns lambasting Princeton for imposing anything less than termination of the male faculty member.  Indeed, due in part to the massive backlash Princeton faced for its decision not to impose the harshest penalty possible on the male respondent, Princeton subsequently changed it policies to impose a default sanction of suspension for faculty violations of the sexual harassment policy, regardless of the individual facts of the case.

80.     In an editorial published in the Daily Princetonian discussing the 2017 Q&A and Princeton's response of not changing its policies, one Princeton student observed: "The University, with its $25.9 billion dollar endowment, well-connected alumni, and strongly-opinionated student body, would likely face severe public backlash, as it has in the past, if it rolled back its Title IX protections for students. With a faculty-student sex scandal in 2017 and two others in 2014, the University's public image has the potential to be tainted more by lax Title IX enforcement . . . ."  Jasman Singh, *Title IX Changes Are Going to Hurt Those that Need the Enforcement the Most*, The Daily Princetonian (Nov. 28, 2018), http://www.dailyprincetonian.com/article/2018/11/title-ix-changes-are-going-to-hurt-those-that-need-the-enforcement-the-most.

81.     Singh continued, "DeVos's Title IX reform seeks to hinder the progress that today's #MeToo movement has made in creating transparency and exposing corruption and

19

abuse at the highest levels of our society.  With a nationally covered faculty-student sex scandal in 2017, the wound is fresh for Princeton . . . ." *Id.*

82.     On information and belief, Princeton's history of complaints, OCR investigations, considerable bad press, and heavy student criticism regarding its perceived mishandling of claims of sexual misconduct committed by male students and faculty—which continued through the time period of Roe's complaint against Plaintiff—placed extremely heavy pressure on Princeton to "over-correct" by favoring protection of female students and finding male respondents guilty regardless of the facts of the case.

83.     Indeed, on information and belief, on July 28, 2018, OCR opened an investigation of potential gender bias stemming from Princeton's offering of a Rape Aggression Defense System course only to female students.  The course description described the disputed program as "dedicated to teaching <u>women</u> defensive concepts and techniques against various types of assault."  *See* Philip Sean Curran, *University Programs Under Fire for Title IX Complaints*, The Princeton Packet (Aug. 3, 2018) (emphasis added), *available at* https://issuu.com/centraljersey.com-newspapers/docs/pp_08-03-18.

84.     Furthermore, according to Princeton's 2017 We Speak report, assessing campus climate survey results, approximately 8% of male undergraduates reported experiencing nonconsensual sexual contact, and approximately 44% of male students who reported experiencing sexual misconduct stated it was perpetrated by women.

85.     Notably, the same survey revealed that the percentage of male students who believe that Princeton does <u>not</u> hold perpetrators of sexual misconduct accountable for their actions was nearly double the percentage of female students who felt that way.  Taken together, these statistics imply that Title IX complaints against female students are pursued at a lower rate,

and female respondents are found responsible at a lesser rate and sanctioned less harshly than male students accused of sexual misconduct.

86.     On information and belief, in addition to the threat of bad press, campus unrest, and the loss of federal funding, Princeton also faced the threat of additional financial losses, such as the tuition reimbursements resulting from the 2014 OCR resolution, if it failed to find male students accused of sexual misconduct responsible and punish them severely.

87.     On information and belief, this direct and constant pressure created an institutional bias against males accused of sexual misconduct, which infected Princeton's processes and procedures as applied to Plaintiff.

88.     On information and belief, in the time period leading up to Princeton's adjudication of the Title IX claims against Plaintiff, the internal and external pressure placed on Princeton to aggressively pursue claims of sexual misconduct allegedly committed by males lead to an institutional bias in the process, as well as selective enforcement based on gender.

89.     The pressure on Princeton to favor Title IX complainants, to take complaints at face value, and to summarily suspend or expel Title IX respondents has only increased in the time since Plaintiff's case was decided:   In April 2019, a Title IX complainant who was dissatisfied with Princeton's handling of her case defaced numerous parts of the campus with phrases like "Title IX protects rapists."

90.     The student was fined by the school and placed on probation for the defacing of school property.

91.     In response, the Princeton student body sprung into action, setting up a GoFundMe page to pay the student's fines, and staging a protest against Princeton's Title IX office for being too lenient on alleged assailants.

92.     The protesting students lambasted the Title IX process as not survivor-centric, indicating that the process of being interviewed and questioned re-traumatizes complainants, and demanded funding to provide attorneys for complainants (and not respondents), so that they may more successfully prosecute their cases.

93.     Within hours, the GoFundMe page had raised nearly double the amount of the students' fines, pledging to donate the excess to Womenspace, "a local non-profit agency that provides numerous services to women in crisis."

94.     One of the donors to the GoFundMe page, a Princeton professor, commented, "I am so furious that the university admin would slam a student like this, and for what she did.  I will write a letter to the president and provost . . . ."

95.     In addition, Princeton's SHARE counselors mass-emailed a link to the GoFundMe page to the Princeton student body, seeking donations and stating that "**Title IX does protect rapists**."  (emphasis in original).

96.     The email also contained patent misinformation regarding the proper standard for consent—which is particularly disturbing, given it was authored and distributed by Princeton's own office dedicated to educating students on sexual harassment and assault.

97.     The serious, wide-spread, and vitriolic backlash directed toward Princeton for daring to penalize a single female Title IX complainant for blatant conduct code violations displays the immense and uniform pressure placed on the University to venerate female Title IX complainants and severely punish respondents.

## II.     PRINCETON'S HISTORIC REFUSAL TO ADDRESS PROBLEMS AT THE EATING CLUBS.

98.     Throughout Plaintiff's Title IX case, he repeatedly recounted events at Tiger

Inn that constituted flagrant violations of Princeton's various conduct policies, including the sexual misconduct policy and the anti-hazing policy.  Yet, Princeton did virtually nothing about Plaintiff's reports.

99.     Apparently, Princeton is more than happy to sit on the sidelines as egregious sexual harassment, physical abuse, and hazing takes place at the eating clubs, as long as it can plausibly shirk any responsibility for these bad acts by shrugging off the eating clubs as "independent, private institutions that do not have any formal ties to the University"—a spurious claim, considering they are centers of student life that are exclusively for Princeton student use, and for which Princeton provides both financial and administrative support.

100.     As described on Princeton's own website:

> Princeton Eating Clubs are part of a tradition that dates back to 1879. In the early years, the University did not provide students with dining facilities, so students created their own clubs to provide comfortable houses for dining and social life. Eating clubs are unique to Princeton and the most popular dining and social option for students in their junior and senior years. . . .  Students are eligible to join a club in the spring of sophomore year, and that is when most students join. All of the clubs, both selective and open, organize events for sophomores to visit the clubs to learn more and meet members.  Students join as social members for the balance of their sophomore year with some limited meals, but full membership begins in the fall of junior year.  Some of the clubs continue to take new members who are juniors and seniors as well. Currently, 70% of upperclass students (juniors and seniors) are members of a club.

> The clubs each have approximately 150 – 200 undergraduate members and maintain strong ties with their alumni members. Alumni frequently return to campus during the fall for a game, or in the spring for reunions, and will often use their club as a home to have a meal, catch up with friends, and have the opportunity to meet current undergraduate members. Membership in your eating club lasts for life, and many Princeton students say their closest friendships, during and after college, were formed with their clubmates.

> (emphasis added).

101.    Indeed, a 2010 Report by the Task Force on the Relationship Between the University and the Eating Clubs recognized that "[w]hether by design or default, most social life at Princeton revolves around the clubs, and . . . the burden of providing students with social life falls on them and their members, even though the participants in their parties and activities include many non-members . . . ."

102.    Moreover, because Princeton has no officially recognized fraternities or sororities, eating clubs provide the forum for a considerable portion of Princeton students' social activities:

> In the absence of dining halls in th[e upper classmen] dorms, more than 70 percent of juniors and seniors join an eating club. . . . The [eating] clubs have evolved into much more than a place to take meals and can border on an obsession for those vying for entry to the older, more prestigious ones. . . . The clubs have also become known for underage drinking and noisy parties, in part because of the university's longstanding ban on fraternities and sororities. . . . "You talk to people who are 60 or 70 years old, and the thing they remember most about being at Princeton is being in the eating clubs," . . . .
>
> Winnie Hu, *More Than a Meal Plan*, New York Times (July 29, 2007) (emphasis added).

103.    In that regard, much like the traditional fraternities they supplant, Princeton's eating clubs form the basis not just for students' social connections while at school, but also provide a network of well-connected alumni once they graduate.  Counted among Princeton's eating club alumni are Woodrow Wilson, Supreme Court Justice Elena Kagan, F. Scott Fitzgerald, Jimmy Stewart, Donald Rumsfeld, and Jeff Bezos.

104.    As such, membership in an eating club is not merely a meal plan option, it is a

highly coveted, competitive, selective process[5] that will dictate a students' future social life at Princeton and, potentially, their future career opportunities.

105.   "Bicker" is the name for the three-day application process of trying to get into a selective eating club at Princeton. The bicker process involves various games, events, competitions, and interviews between eating club members and prospective members.

106.   Despite Princeton's regular attempts to disclaim liability for misconduct at the eating clubs, the reality is that Princeton has long enjoyed "an interdependent relationship" with the eating clubs "that is ongoing, cohesive, [and] reciprocal." *See* 2017-2018 Final Report of the Task Force on the Relationship between the University and the Eating Clubs.

107.   W. Rachel Calhoun, Princeton's Vice President for Campus Life—who also served as a member of the Student Appeals Committee that considered and ultimately denied Plaintiff's appeal—has acknowledged that the clubs rely on University resources as part of that "interdependent" relationship.   Anna Wolcke, *Behind Closed Doors: How Princeton's Administration Is Turning a Blind Eye to Serious Safety Issues in Its Secret Bar District*, Nassau Weekly (Feb. 17, 2019).

108.   In 1990, the Supreme Court of New Jersey recognized the interdependent relationship between TI and the University, holding that "[w]here a place of public accommodation and an organization that deems itself private share a symbiotic relationship, particularly where the allegedly "private" entity supplies an essential service which is not provided by the public accommodation, the servicing entity loses its private character and becomes subject to laws [regarding public accommodations.]"  *Frank v. Ivy Club*, 120 N.J. 73

---

[5]  While some of Princeton's eating clubs are "sign-in," meaning they do not select members by the "bicker" process, Princeton's oldest and most prestigious clubs—including TI—are competitive bicker clubs.

(1990).

109.    In that regard, the University supplies considerable resources to the eating clubs and their membership, including: (i) University-sponsored wi-fi and connection to and use of Princeton's network; (ii) increased financial aid to juniors and seniors specifically to subsidize membership in the eating clubs; and (iii) the opportunity to utilize "shared meal plans" between Princeton and the eating clubs, the application for which is controlled and administrated through Princeton's campus housing registration process.

110.    In addition to the shared resources between Princeton and the eating clubs, they also share a code of conduct:   The eating clubs have adopted a "statement of principles" that expressly incorporates Princeton's conduct policies into the club policies.  In turn, Princeton's conduct policies define their scope of application as including "conduct that occurs on University property (i.e., on campus) and in the local vicinity."

111.    In addition, Princeton's conduct policy regarding hazing expressly states that it applies to the eating clubs, and Princeton even created a specific behavior policy for the eating clubs, which it coyly titles, "Conduct at Prospect Avenue Clubs."

112.    In sum, the eating clubs form a central part of the social scene at Princeton, receive University resources and administrative support, incorporate the Princeton code of conduct into their own policies, and, on information and belief, cater exclusively to Princeton students and their guests.

113.    Indeed, Mark Burstein, Princeton's former executive vice president, summed up the relationship as follows: "We see a strong connection to the eating clubs . . . .You can't really separate out entities that are so essential to your student population. I would say that we are part of the same family."  Winnie Hu, *More Than a Meal Plan*, New York Times (July 29,

2007).

114.     Thus, despite Princeton's thinly veiled claims of separate ownership, it is irrefutable that Princeton exercises considerable control over the eating clubs, and at the very least, over the conduct of Princeton students therein.

115.     Moreover, despite the undeniably well-meaning foundation of the eating clubs, it is equally undeniable that such clubs have had a long history of rampant alcohol abuse and misconduct, dating back over thirty years:

> After eating club sign-in ceremonies at Cloister Inn and Charter Club on Feb. 6, 1988, <u>39 students</u> ended up at McCosh Health Center with alcohol poisoning. Seven more were sent directly to Princeton Medical Center, now known as the University Medical Center of Princeton at Plainsboro, with one sophomore in an <u>alcohol-induced coma</u>.
>
> Shriya Sekhsaria, *A Walk Down the Street: Looking Back at Eating Club Officers' Long History of Resignations*, Daily Princetonian (Jan. 2, 2018) (emphasis added).

### A.   <u>The Tiger Inn: "Princeton's Animal House."</u>

116.     In addition to its reputation as one of the oldest and most prestigious clubs at Princeton, the Tiger Inn is equally infamous for its historic culture of alcohol abuse, sexual harassment, belligerence, and dangerous misbehavior.

117.     In 1987, Princeton held its first "Take back the Night" event for survivors of sexual assault.  As the event participants marched down Prospect Avenue, "Princeton's version of a fraternity row," it was noted that anecdotal reports of sexual assault at the eating clubs far outnumbered reports of assault elsewhere on campus.  *See* Caroline Kitchener, *When Helping Rape Victims Hurts a College's Reputation*, The Atlantic (Dec. 17, 2014).

118.     The greeting that event participants received from Princeton's eating club members did nothing to dispel those stories:

When the marchers turned onto Prospect Avenue, they found a group of 30 male students waiting for them. One held a sign that said "We can rape whoever we want." Another pulled down his pants, yelling, "You can suck my dick!" The rest shouted other threats and insults, including "Get raped!" "Fucking beat them up!" and "Take back the dykes!" Two of the men then drove a car towards the marchers, crashing into two protesters at the front of the group.

*Id.*

119.   A few years later, as TI was the last eating club at Princeton vehemently fighting against gender integration, one reporter unveiled some of TI's long-standing traditions:

For no one knows quite how long, new members at the Tiger Inn have participated in an induction ceremony unlike that at any other Princeton University eating club.   Initiates, once sufficiently sloshed, are hoisted into the air and passed hand to hand down the club's wide wooden staircase. At the bottom, they are presented with a Tiger Inn striped tie, which they immediately put on.  The tie is all they have on.

Despite principled talk about the Constitution, what appears to be at stake is whether a group of Ivy League gents must change traditions that include running around naked, fighting with plastic clubs and Viking swords, degrading each other's female friends and drinking themselves sick. The only aspect of their clubby ways that Tiger Inn members seem to take seriously is the vow to keep their rituals so secret that most went unrevealed until a student's anthropology thesis told all.  "At a school like Princeton, part of what makes Tiger Inn great is there are no academic or intellectual activities here," said Stockton Williams, club president. . . . "Really it's a bunch of guys getting drunk, and it's stupid and sophomoric."

. . . Traditions that have evolved from one Tiger Inn generation to the next include "Viking Night," "Trees and Trolls" and "Tequila Sprints." . . . [P]hotographs show, for example, young men in togas or ripped T-shirts chugging beer and vomiting collectively. They also are seen using indelible markers to write profanity on each other's buttocks and chests . . . .

Laurie Goodstein, *Raucous Tiger Inn and the Male-Bonding Thing*, Washington Post (Dec. 21, 1990).

120.   Over time, although TI's membership slowly became a mix of male and female,

the primary TI traditions—nudity, excessive alcohol consumption, and degradation—remained steadfast.

121.    In 2006, the Tiger Inn was forced to go "dry" for two months following its initiation ritual "pickups," due to "problems with alcohol abuse, including two reports of alleged sexual assaults."   Jennifer Epstein, *A Reformed Tiger Inn Opens Its Doors Again***,** Daily Princetonian (Apr. 13, 2006).  On information and belief, these reports were the second instance of sexual assault allegations at TI that year.  *See* Winnie Hu, *More Than a Meal Plan*, New York Times (July 29, 2007).

122.    Hap Cooper, a Princeton and TI alumnus who served as TI's graduate advisor for over a decade, observed, "It had gotten to the point where people on Prospect were saying, 'It's T.I., what do you expect?'" *Id.*

123.    Following this event, TI's leadership vowed to address the dangerous culture at the eating club.  They instituted new safety policies, citing "the club's attempt 'to do the right thing' and 'encourag[e] different values, a different culture' of safety and respect on [Prospect] Street."   Jennifer Epstein, *A Reformed Tiger Inn Opens Its Doors Again***,** Daily Princetonian (Apr. 13, 2006).

124.    In that regard, Hap Cooper stated that TI was seeking to "change the culture and practices of the club, making it the 'fun and safe place it should be' . . . 'We're concerned about alcohol and the bad decision-making that can result,' [Cooper] said." *Id.*

125.    One of TI's new policies to spring from this event, which was included in a nine-page document distributed to TI members, was that "only those members who are 21 or older [will be permitted] to go behind the taps and serve beer. Servers are expected to abide by the legal drinking age and '[a]lcohol will NOT be served to anyone without a valid [hand] stamp or

who is known to be under 21 years of age,' the document said." *Id.* (second and third alterations in original).

126.    According to TI representatives, "the club [was] ready for significant value-based reform," and wanted to "facilitate 'morals, values and culture, personal accountability.'" *Id.* In that regard, they noted that "[t]he problem seems to be a complex interaction of high-risk drinking, group dynamics, peer pressure and the intimate nature of the Princeton social scene," which "act to create a context that amplifies the danger of these heartrending events occurring while discouraging students from preventing them or[,] after they have occurred, from reporting them for fear of being socially ostracized or marginalized." *Id.*

127.    On information and belief, Princeton is well aware of the pressure that students face when competing for membership in an eating club, as well as the severe ostracization one would face should he or she end up being responsible for more oversight by the school, or, even worse from their perspective, shutting down the club.

128.    However, rather than taking proactive steps in response to this understandable hesitation, Princeton relies on it as an excuse to sit by the wayside and do nothing, claiming that it is simply powerless unless potential reporting students—usually sophomores—name specific TI members and the specific acts each person committed, despite the fact that Princeton knows the identities of the club officers and members, and could easily investigate more generalized claims.

129.    Presumably, the 2006 changes in TI's safety policy and seemingly serious concerns by TI's representatives and governing body should have led to a decrease in underage and excessive drinking, lower peer pressure, and less fear of being socially ostracized in case of reporting.  Yet, few of those objectives came to fruition.

130.    Just six months later, TI's president was criminally charged with serving alcohol to minors.  The charge was then transferred to the graduate board, allowing the president to skirt any personal responsibility.  On information and belief, Princeton took no action in response to the charges against the TI president.

131.    In 2010, members of the eating club governance and Princeton administrators joined together to form a "Task Force on the Relationship Between the University and the Eating Clubs."

132.    Noting that "more than two-thirds of all juniors and seniors join the 10 clubs that currently exist, and for members and many nonmembers alike, the clubs play a central role in the social life of the campus," the Task Force issued a report in May 2010 to identify the main objectives and recommended action plans to improve Princeton students' experiences vis-à-vis the eating clubs.  At one of the Task Force meetings, a member raised the issue of the "dark side" of the eating club culture, including its "culture of alcohol."

133.    The Task Force report section on "alcohol and safety" read as follows:

> Many older alumni remember a time when alcohol was much less central to social life at the clubs than it appears to be today. They remember limits on the number of party nights that could occur each year and the amount of time a club could spend "on tap." Now most clubs treat every Thursday and Saturday night as a party night, and beer may be on tap most if not all nights of the week. One alumnus characterized the change as one from "eating clubs" to "night clubs," and many asked whether it was possible to scale back the centrality of alcohol in the life of the clubs. The concern was not about the responsible consumption of alcohol, but its pervasiveness, especially in settings where most club members are likely to be below the legal drinking age. There were also concerns that a number of students are deterred from joining clubs because of this alcohol culture; that emphasis on alcohol detracts from other positive aspects of club membership; and that emphasis on alcohol can encourage excessive drinking . . . .
>
> [T]he fact that the alcohol is "free" can encourage excessive consumption, and unfortunately there continue to be occasions

<u>when hard alcohol is consumed and dangerous drinking is encouraged, or at least condoned, especially during initiations. Students express concerns about pressures they feel to drink at the clubs or as part of the selection process, and about drinking contests and other organized incentives to drink to excess.</u> On the Saturday of initiations at one of the clubs this spring, hard alcohol was served to newly admitted members at various stations within the club, and the club set up a "sick room" with tarps on the floor, buckets for vomiting, and other preparations in expectation that students would drink to excess. Even if excessive drinking was not "encouraged," it certainly was expected, and the presence of hard alcohol increased the risk that students would in fact need to make use of the room.  While this may have been an isolated instance of bad judgment on the part of this particular club, there are many examples of similar occurrences at other clubs**,** <u>as well as recurring incidents like one club's annual "Viking night," which is characterized by excessive drinking and occasional property damage at other clubs.</u>[6] Excessive drinking has serious health and safety implications not only for the students who drink, but for others who may be affected by their actions, including students who become victims of sexual harassment and assault.

As a task force, we call upon the clubs and the University to:

- Continue to take steps to reduce the pervasiveness of alcohol in the clubs, and especially the risks of excessive drinking. . . .

- Reaffirm the importance of steps taken by the clubs in recent years to better control excessive consumption of alcohol, including better security, wrist-banding, the provision of water and other alternative beverages, and better training of bartenders and club officers. The clubs should consider whether further steps along these lines could be taken, and whether they can take steps to reduce the time on tap and the number of party nights, and to discourage drinking games, dangerous initiation or other "hazing-type" rituals, and other incentives to drink to excess.

2010 Task Force Report at 12-13 (emphasis added).

134.    In that regard, the Task Force made the following ultimate recommendations:

"Consider whether additional steps should be taken . . . to better control excessive consumption

---

[6]  According to the 1990 Washington Post article mentioned *supra*, Viking Night is a Tiger Inn tradition.

of alcohol and discourage drinking games, dangerous initiation rituals and other incentives to drink to excess." 2010 Task Force Report at 22.

135.    In May 2011, Princeton's Working Group on Campus Social and Residential Life addressed similar concerns and made similar recommendations, including that

> The University should significantly increase its commitment to enforce policies that prohibit serious forms of hazing. . . . We are very concerned about the dangerous drinking and other dangerous, demeaning and dehumanizing behaviors . . . . These can occur as part of "hazing," but also in other "requirements" that can be part of the pledge process or "bonding" activities. We heard from several students about the horrific nature of these behaviors . . . .
>
> Hazing is illegal under New Jersey law and University policies already prescribe serious penalties for students who engage in hazing, no matter where or under whose auspices that hazing occurs. We believe the risks associated with this kind of behavior are significant, and that the University should become even more vigilant in imposing highly consequential disciplinary penalties on students found to have engaged in hazing that seriously threatened the health and well-being of any student. In making this recommendation we intend to encompass serious hazing wherever it occurs. . . .
>
> May 2011 Working Group Report at 34-35.

136.    Much like TI's sweeping declarations of change in 2006, and the recommendations of the Task Force just one year prior, these objectives yet again proved to be little more than lip service.

137.    According to a 2013 article in the Atlantic:

> Walk down Prospect Avenue in Princeton, New Jersey on the first Sunday in February, and you'll find a horde of shivering college sophomores huddled together on a front lawn, smeared in ketchup, maple syrup, and egg yolk. They're organized into stations: one group choking down live goldfish, the other pounding out push-ups as senior members shovel dog food into their mouths. These are the students trying to win membership at Tiger Inn (or TI), widely known as the frattiest and hardest-drinking of Princeton University's 11 eating clubs. I'm a student at Princeton, and before I even arrived on campus my freshman year, I heard the Tiger Inn

> stories: <u>competitive projectile vomiting, harmonious chanting of "tits for beer," and naked guys standing on tables while strumming their "penis guitars."</u>

Caroline Kitchener, *There Is No Pressure for a Girl to Be a Girl*, The Atlantic (Aug 1, 2013) (emphasis added).

138.   There are no public reports of Princeton taking any action in response to this published account of disgusting hazing activity by TI.

139.   The article, which was primarily about the influx of female TI members, revealed that TI's reputation was as well-deserved as ever:

> As one rising TI senior told me, "The guys always want us girls to chug a beer or take a shot, or be a man." . . . As one male TI graduate put it, Tiger Inn advocates "equal-opportunity slobbery." . . . Tiger Inn remains the club "with the highest per-capita alcohol...consumption and the most booting[7] on the Street," according to the campus paper. And this reputation doesn't just go for the guys. . . . "Sunday brunch pretty much sums it all up," one rising TI senior said. On Sunday morning, everyone comes to the club in sweatpants, because it would be "weird" to show up looking nice. All members sit down together, wolfing down eggs and bacon while proudly discussing their drunken pursuits from the night before. "Girls can say, 'Last night I blacked out somewhere,' or 'I woke up somewhere,'" a recent female TI graduate said. "No one cares."

> *Id.*

140.   In March of 2014, all but two of TI's undergraduate officers were forced to resign their positions after TI hosted an unauthorized party, which was called a "serious security breach."  *See* Lorenzo Quiogue, *Tiger Inn President and Three Officers Resign Following Unauthorized Party*, Daily Princetonian (Mar. 12, 2014).  Although TI's members and the eating club governance were careful not to disclose the precise nature of the unauthorized activity, it was eventually revealed that the unauthorized party was a meeting of the notorious "21 Club." *Id.*

---

[7] "Booting" is slang for vomiting.

141.    A full description of the 21 Club was detailed in a 2009 article in Princeton's own

school paper:

> Founded in 1881, the secret society includes a group of 42 male
> juniors and seniors who must consume 21 beers in 42 minutes at
> their annual contest, held the morning after Winter Formals.  Every
> year, each of the 21 senior members selects one junior who will
> take his place. Five members each are picked from Cottage Club,
> Cap & Gown Club, Ivy Club and Tiger Inn, and one student is
> chosen among independents. . . .
>
> The contest
> The members assemble at one of the eating clubs on the morning
> of the contest . . . . [E]ach club provides one or two kegs.  "It's a
> scary thing … We're all sitting there with a big dumpster in the
> middle, and the older brothers are behind you feeding you beers,
> and you have to [drink one] every [other] minute, no stopping, and
> people are yelling at you," [a member] explained.
>
> Even before the contest begins, the juniors must each drink seven
> social beers in addition to the 21 they will later consume.
> "Keeping it down is not the point," [a member] said, adding that
> there was a certain sense of apprehension among the new
> members.  "There were only five people per club, and we finished
> a keg, like, a half-hour in," [a member] said. "They had to go and
> get another one. That was my first realization: I was, like, 'Oh,
> shit.'"   Most members start vomiting while drinking the social
> beers, he added, noting that the next year's contest is held at the
> club of whoever vomits first because "no one wants it at their
> club."
>
> The last person to vomit is appointed the club's vice president,
> while the member who can chug a pitcher of beer the fastest after
> the contest ends becomes the president, he added.  . . . Every time a
> member vomits while drinking the social beers, the entire group
> must drink an additional penalty beer. This year, there were 12
> penalties in addition to the original 21, [a member] said, adding
> that this year's contest ended early, before all penalty beers had
> been consumed, because many members were unconscious or
> unable to drink more. . . . . "People have gotten [sent to McCosh
> Health Center] routinely every year," he said. . . .
>
> After completing the contest, each member is rewarded with a 21
> Club card, which grants him entrance to all four clubs even on
> members-only nights and allows him behind the tap. Each card

> lists on which beer the member first vomited — for those who
> vomit during social beers, that number is "0" — and in what order
> the member vomited compared to the others.
>
> Melanie Jearlds, *An Elusive Institution*, Daily Princetonian (May
> 15, 2009).

142.   Notably, Hap Cooper, one of the primary governing alumni of TI, was, himself, president of the 21 Club during his time at Princeton—at least according to his own LinkedIn profile.

143.   It is extremely telling that one of the people in charge of regulating and ensuring safety at TI proudly declares himself a former president of a club dedicated exclusively to reckless, dangerous, excessive consumption of alcohol.

144.   Unsurprisingly, Cooper would "neither confirm nor deny" that the unauthorized party at TI in March of 2014 was related to the 21 Club, plainly showing that his priorities lay in protecting the tradition rather than the safety of Princeton students.

145.   Apparently, the party was discovered when members of the TI graduate board reviewed security footage from the incident, showing members of the 21 Club "throwing the place apart" and "throwing up everywhere."  Lorenzo Quiogue, *Tiger Inn President and Three Officers Resign Following Unauthorized Party*, Daily Princetonian (Mar. 12, 2014).

146.   As a result of the forced resignation of most of TI's officers, TI held an election in March 2014 to elect new officers.  Lorenzo Quiogue, *21 Club Forces TI to Elect New Leadership*, Daily Princetonian (July 30, 2014).  The elections were preceded by a "town hall" meeting, where TI members were given details of exactly what happened on the night of the unauthorized 21 Club party.  *Id.*  And yet, the membership by and large kept those details secret; Hap Cooper himself refused to respond to follow-up calls and emails from the author of the

Princetonian article.

147.    In response to the forced resignations, over 100 members of TI signed a petition claiming the resignation was unnecessary: "The decision [to fire four officers] . . . will likely produce no productive results, has served only to further alienate the membership and foster the impression that the Graduate Board views us as irresponsible children . . . .  The truth is this: the new officer corps inherited a hostile environment, which was the product of years of irresponsibility and bad luck."  *Id.*

148.    Despite their protest about the 21 Club incident primarily being the result of "bad luck," and their disdain for being treated as "irresponsible children," TI was in trouble once again just six months later, for multiple incidents.

149.    On or about October 10, 2014, "an intoxicated first year" student allegedly began performing oral sex on a senior member of TI on the dancefloor at a TI party.  Someone took a picture of the event, and two days later, a TI <u>officer</u>—who was, on information and belief, elected after the prior officers stepped down in March—emailed out the photo to the entire Tiger Inn undergraduate listserv, with the caption "Ivy[8] blows, and apparently so does this Asian chick."  *See* Krystal Knapp, *More Trouble for Private Eating Club at Princeton University: Student Allegedly Distributed Photo of Freshman Performing Sex Act at Party*, Planet Princeton (Nov. 4, 2014); *see also* Anna Wolcke, *Behind Closed Doors: How Princeton's Administration Is Turning a Blind Eye to Serious Safety Issues in Its Secret Bar District*, Nassau Weekly (Feb. 17, 2019).

150.    Another TI officer responded on the email chain, "Tru[e]."

151.    Princeton's Daily Crime Log showed a report of sexual assault on October 10,

---

[8] Ivy club and TI have a long-standing rivalry.

2014, with the address of the alleged assault listed as Tiger Inn. It is unknown whether this report relates to the incident on the dance floor, or a separate alleged assault that night.

152.    On information and belief, no TI members reported the photo or the events it depicted to the police. On information and belief, it was a Planet Princeton reporter breaking the story who reported it to police at the beginning of November 2014. *See* Nicole Mulvaney, *Princeton University Private Eating Club Faces Investigation Over Alleged Photo of Sex Act*, NJ.com (Nov. 4, 2014). According to local police, even after they opened a case, their investigation was hampered by the fact that no witnesses would come forward.

153.    In response to an inquiry about the investigation, Princeton spokesperson Martin Mbuga was quick to offer that the Tiger Inn fell under local police jurisdiction, although he did claim a University investigation was underway. *Id.* Hap Cooper also responded to state that TI was conducting its own investigation. *Id.* The outcomes of both of those investigations are unknown.

154.    Approximately a week after Planet Princeton published its article about the alleged sex act email, someone spray-painted the stone walls outside of the Tiger Inn with the words "RAPE HAVEN." *See* Tammy Tseng, *TI Becomes Vandalism Target Following Alleged Distribution of Sex Photo*, Daily Princetonian (Nov. 12, 2014).

155.    On information and belief, it was only <u>after</u> all the news attention to the email incident, as well as the quickly publicized vandalism, that Hap Cooper decided to send a message to the TI membership to address the incidents.

156.    In the email, Cooper blatantly acknowledged the long history of dangerous and inappropriate behavior at TI: "There is a culture <u>re-emerging</u> at TI that makes some of our members feel unsafe. We went down this road a decade ago . . . and it didn't end well. We

WILL NOT go down this road again. All behavior or communication that makes other members feel disrespected, uncomfortable or unsafe must stop now.  Future violations will be grounds for termination."  Jen Chung, *Princeton University Eating Club Called "Rape Haven" After Recent Incident*, Gothamist (Dec. 2, 2014) (emphasis added).

157.    Shortly thereafter, TI's graduate board sent out a survey to the undergraduate members about the incident, as well as the general culture and issues at TI.  *See* Krystal Knapp, *Princeton Eating Club Ousts Two Officers in Wake of Email Scandal*, Planet Princeton (Dec. 1, 2014).

158.    In response to the survey results, the TI officer responsible for the email was asked to step down.[9]  The officer who had responded to email, however, was allowed to remain. *Id.*  The graduate board wrote, "After carefully listening to all sides—and to you—it is clear to us that the actions taken by [the two officers] in the second week of October were offensive, disrespectful and in direct violation of our core values."  *Id.*

159.    Apparently, TI's leadership needed a survey to assess whether distributing photos of a freshman engaging in a sex act, along with a crass racial joke, was "disrespectful."

160.    In the same email announcing the resignation of the officer, TI's graduate board shared that they would be creating a "bicker committee," in order "to preserve the customs we hold dear while making the events safer, less demeaning and more fun for everyone."  *Id.*

161.    Notably, this committee was created three years <u>after</u> the Working Group on Campus Social and Residential Life had urged Princeton to "significantly increase its commitment to enforce policies that prohibit serious forms of hazing;" specifically, the "dangerous drinking and other dangerous, demeaning and dehumanizing behaviors."

---

[9]  A second officer was also forced to resign for a separate email containing denigrating remarks about Sally Frank, the Princeton alumnus who sued for gender equality at the eating clubs.

162.    The graduate board also promised to follow up on other recommendations, including "creating a safe process for members to report incidents or concerns." Krystal Knapp, *Princeton Eating Club Ousts Two Officers in Wake of Email Scandal*, Planet Princeton (Dec. 1, 2014).

163.    Some members of TI expressed frustration that sexual assault was not taken seriously at TI, noting that "the beer tap gets turned off for a period as punishment when furniture is broken, but not when the club's . . . members are demeaned and humiliated." *Id.* They also repeated a concern that TI had allegedly promised to address nearly a decade prior: TI members fear retribution if they report. *Id.*

164.    Despite the TI graduate board's proclaimed intent to "create[e] a safe process for members to report incidents or concerns," when it was discovered that a TI member had leaked Hap Cooper's initial email to a media outlet, a TI officer sent out a club-wide email that read, "it's mole hunting season." *Id.*

165.    On information and belief, yet another officer was also relieved of her position in 2014—making her the seventh officer ousted in one year—this time, for putting another member in a headlock until that member passed out, fell to the floor, and was injured.  As with much of the misconduct at TI, the club handled the matter internally.    Anna Wolcke, *Behind Closed Doors: How Princeton's Administration Is Turning a Blind Eye to Serious Safety Issues in Its Secret Bar District*, Nassau Weekly (Feb. 17, 2019).

166.    On information and belief, the culpable student was not subjected to discipline by the University.

167.    In December 2014—nearly six weeks after the sex act email was first sent out—Princeton told reporters it was still investigating the matter. *Id.*

168.    Presumably, Princeton has access to its students' University email accounts, and it is unclear how or why such an investigation would take over a month with no resolution.   To date, it is unknown whether Princeton imposed any discipline on the members involved with the taking and distribution of the photo.

169.    With TI's governing body and Princeton University repeatedly failing to enforce safety policies at TI, over 100 TI alumni wrote an open letter in December 2014 decrying the club's poor behavior and unsafe culture:

> In light of the incidents this year—and in light of the fact that one set of officers was forced out, only to be replaced by another set of officers who exhibited even worse judgment—we believe that the prevailing culture of the club does not appear to live up to the standards of either the club or the university.  Rather than hoping to address this through the least amount of punishment, the Graduate Board would do better to start from the other direction and consider whether the club should continue operating at the present time and, if so, what conditions the club and its members should be required to meet. . . .

> If members of the Tiger Inn and its Graduate Board take swift and strong action to demonstrate that *any* kind of bias, harassment, exploitation, or assault will not be tolerated, perhaps the current club culture can be reshaped into something worthy of the unique privilege Princeton University students enjoy. Such actions will not erase the shameful events that have occurred recently at Tiger Inn, but anything less is not worthy of the Tiger Inn or of Princeton University.

170.    Addressing the emails that sparked this most recent controversy at TI, Hap Cooper displayed his genuine feelings about the deplorable actions: "each was meant as a joke." Raymond Ollwerther, *Trouble at Tiger Inn*, Princeton Alumni Weekly (Jan. 7, 2015).

171.    This attitude that sexual assault and gender-based degradation are "jokes" to TI's very governing body is emblematic of the TI philosophy and its failure to genuinely address such issues with its membership over the years.  As the TI alumni posited, it seems instead that TI's leadership is more focused on insulating its members from having to take responsibility for their

actions.

172.    In the end, however, Cooper did acknowledge the problems associated with treating such incidents as jokes: they "have the effect of communicating that anything goes at TI," creating "a slippery slope that can lead to real tragedy." *Id.*

173.    In the midst of the scandal surrounding the controversial emails, TI was also under investigation for unrelated incidents of alleged sexual assault – this time, by the very people TI hired to keep members safe.  *See* Grant Golub, *Princeton Police Investigated Allegations Against Tiger Inn Bouncers, Records Show*, Daily Princetonian (Jan. 4, 2015).

174.    According to police records, an investigation was launched into TI's bouncers regarding both (i) their possible involvement in taking the photo of the freshman on the dance floor, and (ii) general allegations of ongoing sexual harassment and assault on TI members, including groping members as they walked in the door.  *Id.*

175.    While the results of the report are unknown, the police investigation did disclose that <u>half</u> of TI's hired safety personnel had criminal records – including charges of battery, distributing narcotics, and felony aggravated assault.  *Id.*  It is unknown what sort of vetting process TI conducted on these safety officers, nor what actions TI took when this information was disclosed.

176.    In response to this investigation, TI's graduate board expressed concern for the "indication of a desensitized sexual and alcohol related culture among the student members;" however, there are no reports that TI fired any of these bouncers.

177.    In September 2016, The Daily Princetonian published an article discussing steps that some of the eating clubs were taking towards preventing sexual harassment and assault. Such steps included having members sign or recite a "consent pledge," and conducting training

through Princeton's SHARE (Sexual Harassment/Assault Advising, Resources and Education) office.  While several clubs engaging in these activities were mentioned by name, there was <u>no</u> report of any action by TI to improve member safety.

178.    Princeton's SHARE director, Jacqueline Deitch-Stackhouse, stated that SHARE worked closely with the eating clubs and the Inter Club Council (ICC) on providing training and information, and creating a "best practices" checklist for the clubs.  However, the Inter Club Council did not require eating clubs to abide by the best practices checklist.

179.    In December 2017, Princeton assembled a new Task Force on the Relationship Between the University and the Eating Clubs, since it had been nearly seven years since the initial Task Force had set forth its recommendations.

180.    On information and belief, no further Task Force meetings had taken place to assess compliance or progress after the issuance of the May 2011 report.  Thus, one of the key purposes of the new Task Force was to "[r]eview[] the outcomes that stemmed from the recommendations of the 2009-2010 task force to determine if particular recommendations require further attention and/or different responses."  The task Force also intended to "[i]dentify[] how the eating clubs might help to achieve the University's long-term goals for the undergraduate experience, especially as they relate to dining, co-curricular activities and creating community."

181.    The Task Force was comprised of a mix of eating club officers, non-member students, Graduate Inter Club Council (GICC) members, and Princeton staff.  The chair of the task force was W. Rochelle Calhoun, Princeton's Vice President for Campus Life.

182.    Around the same time the Task Force was being reassembled, Tiger Inn found itself in trouble yet again for safety violations, resulting in another round of officer resignations.

183.    On or about December 8, 2017, TI held its sophomore semi-formal party.  On information and belief, by virtue of this being a sophomore event, most attendees were under twenty-one years old.

184.    Although TI yet again managed to keep the details the of event under wraps, it was reported that "a lack of appropriate levels of security . . . led to an unsafe environment at the club: excessive levels of alcohol, vomiting, and physicality."  Benjamin Ball, *Tiger Inn President to Step Down*, Daily Princetonian (Dec. 20, 2017).  It is unclear whether "physicality" referred to altercations or sexual assault.

185.    As a result of this most recent dangerous party at TI, the officers again escaped any real punishment for their continuous endangerment of underage students. On information and belief, the only punitive measure imposed on TI by its graduate board was the forced resignation of its president and "safety czar."  *Id.*  On information and belief, the club remained "on tap."

186.    It is unknown whether Princeton took any action against TI's officers for, once again, providing alcohol to underage students and creating an unsafe environment.

187.    As it had done so many times in the past, TI's leadership again promised to "look[] to the future" and "emphasize[] the importance of making safety . . . [an] integral part[] of their club culture."  *Id.*

188.    On information and belief, the safety issue created at the December party was due in part to the fact that one of the TI members "on safety"—meaning, a designated sober member to monitor the club for safety—became so intoxicated that they had to be brought to the infirmary.  *See* Anna Wolcke, *Behind Closed Doors: How Princeton's Administration Is Turning a Blind Eye to Serious Safety Issues in Its Secret Bar District*, Nassau Weekly (Feb. 17, 2019).

189.     On information and belief, because of the consistent safety issues at TI, TI nearly lost its insurance coverage, as only one carrier was even willing to offer coverage, and even then, insisted on numerous addendums and high premiums.

**B.  Plaintiff's TI Initiation.**

190.     Just three months later, under the auspices of a new TI president and "safety czar," Plaintiff was subjected to much of the same mistreatment that had permeated TI culture, virtually unpunished, for decades.

191.     Specifically, TI officers and/or senior members:

a.  Expressly told Plaintiff that cameras and other recording devices were banned from initiations;

b.  Told Plaintiff to do whatever the senior members told him to do, and to go along with it even if it gets "weird;"

c.  Provided Plaintiff, who was under the legal drinking age, with alcohol;

d.  Handed Plaintiff cup after cup of beer and directed him to "chug," resulting in Plaintiff's consumption of approximately seven beers in two hours;

e.  Directed Plaintiff to take off his clothes;

f.  Poured beer over Plaintiff;

g.  Flashed their naked genitals at Plaintiff;

h.  Directed Plaintiff to strip down further and run around TI, outside, in February; and

i.  Slapped Plaintiff repeatedly on the back, hard.

192.     After these initiations, while he was heavily intoxicated, Plaintiff was then

approached on the TI dance floor by a senior member of TI.[10]  The member attempted to dance

with Plaintiff, but he denied the advance.  Later, when Plaintiff was alone on the dance floor, she

approached him again, confirmed that he was a sophomore (in other words, an initiate), and

kissed him on the mouth.

193.    This senior TI member then directed Plaintiff to gather his things and meet her to

leave TI.  She then walked Plaintiff to her dorm room.

194.    During this walk, the older and physically larger TI member proceeded to tell

Plaintiff numerous personal details that she knew about his life, background, and interests.

Apparently, she learned this information through the bicker process.  As far as Plaintiff could

recall, Plaintiff had never spoken with her before.

195.    The TI member then led Plaintiff to her private dorm room, where she admittedly

proceeded to initiate sexual activity.

196.    Plaintiff reported all of this to Princeton's Title IX office.

197.    In response to the blatant evidence of hazing and sexual harassment, Princeton did

what it always does when faced with misconduct at the eating clubs—absolutely nothing.

198.    On information and belief, Princeton did not reach out to TI's officers or other

members present at initiations to investigate Plaintiff's report.

199.    Less than three weeks after the hazing and harassment suffered by Plaintiff at his

TI initiation, the Inter-Club Council farcically issued a welcome letter to new and old eating club

members that "highlighted the ICC's rules on sexual misconduct and harassment, possession of

alcohol brought in from outside the club, and hazing," "stating that any form of hazing or

harmful initiation ritual associated with a club is strictly prohibited," reminding students that

---

[10] Roe was a junior at Princeton at the time of the alleged incident.  The phrase "senior member" refers to established members of TI who were either juniors or seniors.

underage drinking is not allowed, and encouraging members to "work to ensure that their club 'maintains an atmosphere free of any pressures on other members, guests and employees relating to sexual misconduct.'"  *See* Claire Thornton, *ICC Releases 'Welcome Letter' to New and Old Eating Club Members*, Daily Princetonian (Feb. 27, 2018).

200.    This painfully oblivious letter is proof positive that when it comes to ensuring student safety and preventing abuses, the eating clubs are great at talking points, but not at actual implementation.  In fact, on information and belief, during the Ivy Club initiations that happened the same week as Plaintiff's TI initiations, a new initiate to the club became extremely intoxicated, fell down the stairs, and ended up in the hospital.  On information and belief, this incident was not investigated by Princeton.

201.    Likewise, as it had done for decades, Princeton refused to hold the older TI members in Plaintiff's case accountable.  To the contrary, Princeton found <u>Plaintiff</u> responsible for sexual assault because the TI member claimed that once she had led the drunken, younger Plaintiff into her room, he allegedly tried to engage in oral sex and digital penetration that she did not want, although she did consent to the intercourse.

202.    As part of Princeton's eventual findings against Plaintiff, Princeton informed Plaintiff that "being under the influence of alcohol is not a mitigating factor in considering the seriousness of your actions."  Princeton refused to acknowledge in any way that the reason Plaintiff was highly intoxicated was because TI had not only provided Plaintiff with alcohol but directed him to drink excessive amounts in a short period of time.

203.    Because of Plaintiff's gender, Princeton refused to see Plaintiff as the victim of sexual harassment and assault, and instead concluded that he must have assaulted Jane Roe, despite any evidence other than Roe's own claims.

C. **Princeton Continues to Ignore Misconduct at the Eating Clubs.**

204.    In November 2018, the newly formed Task Force on the Relationship Between the University and the Eating Clubs issued its formal report.

205.    The report began by solidifying the intertwined, interdependent nature of the University and the Eating Clubs:

> Vision
>
> Princeton University and the eating clubs, working together, strive to provide all undergraduates with experiences that contribute to a campus social life that is vibrant, accessible and inclusive; help to create a sense of connectedness, belonging and community; and enhance the overall Princeton experience.
>
> Guiding Principles
>
> While independent from each other, the University and the eating club leadership (graduate and undergraduate) will continue to nurture an interdependent relationship that is ongoing, cohesive, reciprocal, transparent and candid.
>
> Regular communication and the sharing of information between the University and the eating clubs will increase trust and opportunities for creating more vibrant experiences for undergraduate students.
>
> Report at 3.

206.    The Report set forth the Task Force's "health, well-being, and safety" goals, including to:

> Continue, enhance, and potentially expand existing programs through SHARE and other offices to provide training for eating club officers and members, as part of a larger effort to address concerns about sexual misconduct, alcohol abuse, safety, and health and wellbeing, including expanded programming on mental health.   Continue to improve alcohol and safety policies at the eating clubs . . . . Expand the engagement of peer leaders (e.g., peer health advisors, SHARE peers, etc.) in and with the eating clubs to foster an environment that is healthy and safe. . . . Continue the strong relationship and communication among the University, students in the eating clubs, and the graduate boards of

the eating clubs, including regular University interaction with the Interclub Council and the Graduate Interclub Council.

Report at 4-5.

207.    The Task Force also evaluated the progress made since the previous Task Force's recommendations seven years prior.  According to the new Task Force, the recommendation of "consider[ing] additional steps to address high-risk drinking" was "done (ongoing)."  Report at 7.

208.    According to the new Task Force, the recommendation of strengthening "the Best Practices handbook sections on alcohol usage and safety policy" was also "done (ongoing)." Report at 8.

209.    On information and belief, the "best practices" handbook is still not mandatory, and clubs may adopt or reject those practices as they so choose.

210.    Despite the new Task Force's extremely light touch in asking virtually nothing from the eating clubs in terms of concrete plans to ensure safety, the eating club governance balked at the issuance of the report.  *See* Oliver Efron, *ICC Criticized Eating Club Task Force Report*, Daily Princetonian (Nov. 27, 2018):

> Eating club presidents . . . push[ed] back against a recently released task force report, . . . .  Reassembled in 2017, the task force proposed a series of measures to correct perceived flaws within the eating club system, focusing on diversity, health, and accessibility. Some current eating club presidents, however, criticized the task force's lack of transparency, an absence of concrete implementation plans for the report's recommendations, and a general failure to acknowledge progress that the clubs have already made.

211.    In response, one of the Task Force members acknowledged something that had been evident at Princeton for decades: "Sometimes programs in place on paper are not executed fully in practice."  *Id.*

212.    For example, despite TI's purportedly strict safety measures, such as hiring bouncers and appointing "safety monitors," it ended up hiring bouncers with criminal records who themselves were allegedly harassing TI members, and the so-called sober monitors were apparently unable to refrain from becoming intoxicated to the verge of alcohol poisoning.

213.    Further, as the Task Force member explained, "There can be a disconnect about actually bringing the [SHARE] liaisons to the club. The program exists, but there is a separation between the plan and implementation." *Id.*

214.    In other words, despite prioritizing safety and training on paper, the clubs—and Princeton—have failed to sufficiently implement their highly touted safety measures.

215.    In February 2019, Nassau Weekly published a lengthy article addressing the history of misconduct at the eating clubs, and Princeton's deliberate, intentional refusal to address these long-standing and well-known issues.  Anna Wolcke, *Behind Closed Doors: How Princeton's Administration Is Turning a Blind Eye to Serious Safety Issues in Its Secret Bar District*, Nassau Weekly (Feb. 17, 2019)

216.    As the article aptly explains,

> Here [at Princeton], a remarkable amount of drinking happens in secret, behind the doors of an insular network of clubs that are far wilder than regular bars.  Inside these eating clubs, students who are under the legal drinking age regularly do things that would never be allowed in traditional bars.  Some have gotten so drunk they had to be hospitalized for alcohol poisoning.  Others have slipped on beer-soaked dance floors and broken their legs.  Still others have become so out of control that they have gotten into fights with police officers and bouncers.  None of the risky behavior leads to serious consequences for the clubs or the University.  In fact, the University is benefitting from the silence surrounding the eating clubs. . . .
>
> *Id.*

217.    The author interviewed dozens of students, club members, and Princeton staff,

and "reviewed hundreds of pages of police records and news articles and found a number of

troubling statistics:"

> • In the past five years, police have been called to the clubs more than 200 times, for incidents ranging from alcohol poisoning to assault.
>
> • Serious injuries are commonplace. Since 2013, there have been 11 reported cases in which a student, a bouncer, or a police officer got hurt in a fight. One student had his pinky amputated when his hand got caught in a club's fire escape as he was trying to leave the club in an unconventional way.
>
> • The clubs are the scene of <u>bizarre and violent hazing rituals. In one club, new club members had to undress to their underwear</u> and were showered with ketchup and mustard. In another, <u>students were slapped on their backs until they bled</u>.
>
> • What happens in the clubs often stays in the clubs. The cycle of risky behavior is perpetuated by a strict code of secrecy. Members who do talk risk being ostracized.
>
> • Incidents are documented in public records, but the University does not regularly make checks of them, preferring instead to look the other way.
>
> *Id.* (emphasis added).

218. As per usual, Princeton trotted out its classic line when faced with serous

misconduct at the clubs: "Princeton administrators stress that the clubs are not part of the

University and maintain that they do not regulate what happens in them." *Id.*

219. As the article noted,

> [D]espite the overlap between the University and eating clubs, the University has maintained for years that the two have nothing to do with one another. Administrators have pointed to the separation every time a major drinking-related accident occurs.  And it has occurred a lot.  For the past 50 years, the clubs have been hubs of bad drinking and bad behavior. In 1987, The Associated Press wrote a story about the staggeringly high number of sixteen Princeton students who were admitted to the infirmary with alcohol intoxication and alcohol-related injuries after initiations at several eating cubs. In 1988, two club officers at Charter Club

51

> were arrested and ultimately sentenced to 30 days in jail each for having served alcohol at an event that caused 39 students to require treatment at the University infirmary. Six were taken to a local hospital and one of those six remained in a coma for 24 hours.  The University defended the students, calling the sentence "disproportionate and excessive." . . . Through it all, the University administration has been hands-off. Vice-President for Campus Life Calhoun stated: "We don't really regulate what they're doing in the clubs."
>
> *Id.*

220.   At the same time, however, Princeton acknowledged that the clubs are not truly separate institutions: "The clubs are independent of the University but interdependent," said W. Rochelle Calhoun, the Vice-President for Campus Life of the University as well as the chair of the University's Eating Club task force. She "acknowledged . . . that the clubs are relying more and more on University resources . . . ." *Id.*

221.   Indeed, a former president of one of the eating clubs told the reporter, "Even though eating clubs are technically private institutions, disassociated with the University, they are practically on campus and are even interspersed with buildings where some students take classes . . . ." *Id.*

222.   The article also touched on the extreme pressure the clubs placed on their members not to report misconduct:

> Students binge-drink at many universities. But Princeton is unique in that it is largely kept secret, maintaining the University's good reputation while exposing students to extra risks.  In an email, University spokesperson Michael Hotchkiss said that "The University's Department of Public Safety (PSafe) maintains a strong working relationship with the Princeton Police Department that includes open communication about any serious incidents at the clubs."  What Hotchkiss didn't say is that <u>many clubs ask their members not to call the police.  Even in cases of severe intoxication or injury, they are supposed to call club officers for help first</u>, which means that most incidents never get reported to the police.  "During our first sophomore dinner, the club president

told us that if anything were to happen, find a club officer first and help can be better sought than by just dialing 911," said a member of Cap and Gown Club who doesn't want to be identified for fear of being kicked out.   This response is indicative of <u>a system in which students fear social exclusion if a club finds out that a member has talked with non-members about what's going on inside the club.</u>  "We get sanctioned if we talk with non-members about what happens in the club," he said.

> *Id.* (emphasis added).

223.   The article addressed the dangerous initiation rituals at some clubs, including a description <u>that almost exactly matched what Plaintiff had reported to Princeton a year before the article was published</u>:

> the new men were asked to finish a keg and then to undress. Without warning, older club members slapped new members on their backs. One student was slapped so hard, his back started bleeding. "It was basically physical abuse," said a student who asked not to be identified for fear of losing his membership.
>
> *Id.*

224.   The article highlighted that Princeton's refusal to appropriately manage the clubs results in constant injuries and an ongoing danger to the students:

> Princeton administrators have been careful to keep their distance from incidents like these while reaping benefits from what the clubs provide—an outlet for student stress that allows for hard drinking but does not harm the University's reputation. [One] [s]ophomore . . . badly sprained her ankle on a night out at Cloister Inn in September 2017.  For the following weeks, she was forced to rent an expensive scooter in order to get to her classes.  The University never followed up with her after the incident or offered assistance, and [she] learned that she isn't the only one who was hurt at Cloister Inn.  "The amount of people who have told me they had the same experience at Cloister was insane," [she] said. "People have been complaining about the mosh pit for years."<u>  But the University took no action.  Without close supervision, club leaders are left on their own to make questionable decisions</u>.  They have hired bouncers who have allegedly assaulted and harassed students. . . .  At Cap and Gown Club, [a] security employee . . . threatened to "cut up" two non-members who tried to seek shelter from the cold in 2016, according to police records. . . .  There are

53

other signs that club leaders are not capable of keeping their fellow students safe.  Tiger Inn has a few members "on safety" on nights when the club is open to all students. Members on safety are supposed to stay sober and help other students. But instead some chug beers and become more drunk than the students they are supposed to keep an eye on.

*Id.*

225.    The article also shows that, despite the latest Task Force Report, and all of the other talk of prioritizing safety, nothing really changes:

This year, due to the heavy drinking during frosh-week, the first week before the new academic year begins, all eating clubs were closed to first-years after the first night.  According to a *Daily Princetonian* article, 28 students were brought either to the local hospital or to the University health center during the weekend of frosh-week.  Yet there are suspiciously few police reports pertaining to this weekend.

*Id.*

226.    For decades, Princeton has relied on a technical separation between the eating clubs and the University in order to relieve itself from liability or any obligation to genuinely address the rampant misconduct that is well known, well documented, and apparently, even reported to the school directly.

227.    While Princeton excuses itself from responsibility for bad behavior at the clubs, it proudly touts the clubs to prospective students, and benefits from the clubs' provision of social events directly and exclusively for Princeton students.  In exchange, Princeton provides resources to enable as many students as possible to join the clubs and/or attend their parties.

228.    Princeton's ongoing, intentional, deliberate refusal to adequately address hazing and sexual harassment at the eating clubs, and specifically at TI, of which it was well-aware, resulted in the harassment and assault Plaintiff suffered at TI, by TI members and/or officers.

229.    Moreover, even after Plaintiff reported the harassment and assault, Princeton

refused to genuinely investigate or hold his assailant(s) responsible.

### III.   PRINCETON PROSECUTES PLAINTIFF.

#### A.  Plaintiff and Jane Roe.

230.    Plaintiff matriculated to Princeton in Fall of 2016 with an expected graduation date of June 2020.

231.    Before attending Princeton, Plaintiff excelled academically, receiving distinctions as AP scholar, an Honor Roll student for many years, and a member of the National Honor Society.

232.    Plaintiff also gave back to the community as a member of a community service group and a volunteer teacher at his local community center.

233.    Plaintiff was drawn to Princeton because it is one of the top-ranked schools in the nation and is known for the professional networking opportunities it provides to students.

234.    As an aspiring young entrepreneur who has already played a major role at a start-up social networking company, Plaintiff was particularly drawn to the professional benefits that a Princeton alumni network would bring.

235.    In that regard, once at Princeton, Plaintiff sought to join an eating club in part for the social benefits, but also for the alumni and networking opportunities it would create for him moving forward.

236.    Plaintiff elected to apply to Tiger Inn as it is one of the oldest and most selective clubs at Princeton.

237.    On information and belief, Jane Roe matriculated to Princeton in Fall of 2014 with an expected graduation date of June 2018.

238.    Jane Roe was an athlete and a marathon runner, who stood several inches taller

than Plaintiff.

239.   Jane Roe was a member of the Tiger Inn and a junior when Plaintiff was a sophomore.

240.   On information and belief, as a senior TI member, Jane Roe participated in the planning and execution of TI's initiations in February 2018.

241.   On information and belief, Jane Roe knew that Plaintiff, and other bickerees, were under the legal drinking age, and that bickerees would be ingesting a considerable amount of alcohol at initiations, which TI would provide.

242.   On information and belief, Jane Roe first took notice of Plaintiff during the bicker process, well before his initiation.

243.   Although Plaintiff had never spoken directly with Jane Roe, she discovered considerable personal information about him by virtue of the bicker process. On information and belief, Jane Roe voted to accept Plaintiff into TI and even spoke on his behalf during the voting period.

### B.   Plaintiff's TI Initiation.

244.   On or about February 3, 2018, Plaintiff applied to TI.  The next day, the bicker process started and the sophomores who wanted to join had to go through a series of interviews and activities.

245.   For example, bickerees were asked questions such as who they thought was the hottest girl or guy in the club.  Bickerees were also required to tell a story of their craziest night out, the most dangerous thing they had ever done, and who they would choose to kick out the club.  In addition, bickerees were asked to complete tasks such as asking out a fellow bickeree.

246.   On February 9, 2018, Plaintiff was notified that he had been accepted as a new

member of the TI.  Initiation would be the next evening.

247.    On February 10, 2018, the new TI members were told in an email from the club president that they should absolutely not be late.  They were also told that no phones or video cameras were allowed during initiations.

248.    In a text message sent to TI initiates, they were expressly informed that "Alc and chasers will be provided."

249.    Traditionally, a "chaser" is consumed after a shot of hard alcohol.

250.    Once the initiates arrived at TI for the official initiations, upperclassman told the new members to do whatever the upperclassmen said, and just go along with what was going on even if it gets "weird."

251.    TI members and/or officers provided the initiates, who were almost all underage—including Plaintiff—with alcohol.

252.    The themes of the night were: (i) competitive alcohol consumption; (ii) go along with whatever happens; (iii) embrace anything strange; and (iv) do what upperclassmen say.

253.    The initiates were told to strip to their underwear, or more if comfortable.  Most men, including Plaintiff, were only in boxers. Some men were fully naked.  Several men wore boxers but flashed their genitals at the others.

254.    Plaintiff was repeatedly handed cups of beer by older TI members and told to chug.   Plaintiff consumed approximately seven beers in two hours, and became very intoxicated.

255.    Older TI members also threw beer on Plaintiff, slapped him hard on the back, and told him to run a "naked lap" around the building.  It was a drizzly February evening.  Plaintiff complied.

256.    Plaintiff complied with everything the TI upperclassmen said, as he was instructed.  Plaintiff did not want to be kicked out of the club or looked upon as not a team player—especially as he planned to eat virtually all his meals and center his social life at the club for the next two years.  The pressure to conform was immense and overwhelming.

257.    Since Plaintiff did not have family close by, and one of his parents lived in Liberia, he ached for a close-knit pseudo-family close to or at Princeton.  He was desperate to appease the club members in order to remain in their good graces.

258.    After being initiated, all TI members – male and female – then joined in the basement for a dance party, still in their underwear.

259.    Close to midnight, Plaintiff was in a circle of people dancing. Jane Roe was a part of the dance circle, and she attempted to reach out to Plaintiff by pointing at him to come to her.  Plaintiff ignored the advance.

260.    About ten minutes later, Plaintiff was standing alone, and Jane Roe approached him. She asked Plaintiff if he was a new sophomore in the club, which was a strange question considering Jane Roe voted for him and would later reveal that she knew numerous personal details about him.

261.    Plaintiff confirmed that he was a sophomore. Jane Roe then leaned in and kissed Plaintiff on the lips. She did not ask for consent or give any advance indication that she was going to kiss him.

262.    Plaintiff felt uncomfortable, but after hours of initiations and in his considerably intoxicated state, felt that he had to go along with anything any of the upperclassmen wanted to do.

263.    Jane Roe told Plaintiff to go grab his pants and put them on, and meet back up in

the basement.  Plaintiff complied.

264.    When they met back up, Jane Roe asked Plaintiff to leave the club with her.

265.    Plaintiff was extremely uncomfortable that a person he didn't know would ask him to go back to her room within minutes of meeting him.

266.    However, given that it was initiations, and Jane Roe was a junior, and Jane Roe was older and physically bigger than Plaintiff, and new members were told to accept all requests and commands from senior members, and go along with any "weird" activity, and Plaintiff had been plied with alcohol, Plaintiff did as Roe asked.

267.    Once they left the club, Roe led Plaintiff, by the hand, to her dorm room. Plaintiff had no idea where Roe lived and was simply following Roe.

268.    During the walk, Jane Roe stated: "It's crazy how we know everything about you guys, but you guys know nothing about us."  She then proceeded to tell Plaintiff numerous details about his background, life, and interests, including his favorite sports team.  She also told him that she was one of the members who voted him into TI.  Plaintiff felt even more pressure not to upset or offend Roe.

269.    Plaintiff was uncomfortable with Roe's focused interest in him, out of the nearly two hundred bicker applicants, as well as her implication that he owed his admission to her.

270.    From the beginning, Plaintiff felt very pressured to say yes to Jane Roe, because if he said no it was clear she could make life difficult for him with respect to the club.  Plaintiff also did not want it to seem as though he did not fit in with the club culture. He feared the club members could reject him, claiming he did not complete initiations.

271.    On the walk, Roe said she was cold, as she had forgotten her coat.  Plaintiff gave Roe his jacket and walked in just his shirt in the cold February rain.

272.    Finally, Roe and Plaintiff arrived at her dorm. She led Plaintiff upstairs, and they entered her room, which was a large single bedroom.

273.    In Roe's room, the two began to kiss, and eventually moved to the bed, with Roe on top of Plaintiff.  Roe began undressing, so Plaintiff followed suit.

274.    Roe then—without any prior discussion or permission—pulled down Plaintiff's underwear and began performing oral sex on him.  She then told Plaintiff that she wanted to have intercourse and retrieved a condom for Plaintiff to put on.

275.    Plaintiff did not want to have sex with Roe.  He was drunk, freaked out, and did not know her.  But, at that point he felt there was no way out of the situation without offending Roe and thus endangering his position at TI.

276.    Plaintiff then had sexual intercourse with Roe.  During the intercourse, he was not touching her body.  Rather, he kept his hands planted on the bed.  At some point, Jane Roe told him to hurry up and climax inside of her.

277.    After they finished having sex, Jane Roe attempted to cuddle with Plaintiff, but he was physically uncomfortable and separated himself from her.  Jane Roe asked Plaintiff whether he wanted to spend the night, to which he responded, "maybe."

278.    Jane Roe then initiated intercourse a second time.  However, Plaintiff was not fully aroused, so they stopped.

279.    Plaintiff then digitally penetrated Jane Roe.  Jane Roe moaned and moved her body in ways indicating pleasure, and subsequently climaxed.

280.    Shortly afterwards, the parties engaged in intercourse again.  Jane Roe gave Plaintiff directions, and placed his hands on her body.

281.    Plaintiff could not orgasm, so he asked Jane Roe to perform oral sex on him.

She said no, and he did not press any further.

282.    Jane Roe again asked Plaintiff to stay the night, indicating they could have sex again in the morning.  Plaintiff declined, and returned back to his dorm.

283.    The night of initiations was the first time Plaintiff had met or encountered Jane Roe, a senior Tiger Inn member.  Through Jane Roe's actions on the TI dance floor and her subsequent disclosures about the details of Plaintiff's life, it was clear she was interested in him and had targeted him specifically.

284.    After Jane Roe told Plaintiff how much she knew about him and how she helped get him into the club, the last thing Plaintiff wanted to do was upset her, so he did everything she asked of him, including engaging in sexual activity with her when he otherwise would have declined.

285.    After initiation night, the next time Plaintiff saw Jane Roe was on February 14, 2018, at Tiger Inn.  They did not speak to each other.

## C.  The Title IX Process Begins.

286.    On February 20, 2018, Plaintiff received an email from Princeton's Title IX coordinator, Regan Crotty, notifying Plaintiff that allegations of sexual misconduct were made against him and that Vice Provost Michele Minter had appointed a panel of three investigators (including Crotty herself, Joyce Chen Shueh, and Edward White) to review the matter.

287.    In accordance with Princeton's Policy, the Title IX coordinator and the other two panelists would serve as the investigators as well as the ultimate adjudicators of Plaintiff's guilt.

288.    The allegations in the email were vague, and simply stated: "Unfortunately, allegations have been made with my office that on the night of Saturday, February 10, you allegedly engaged in non-consensual sexual penetration and non-consensual sexual contact with

another student [J.A.][11] in a dormitory room."

289.     After receiving Crotty's email, Plaintiff was confused and asked to speak with Crotty in person in order to discuss what the allegations were about.  She refused to discuss the substance of the allegations, but said Plaintiff could submit something in writing.

290.     Wanting to address the allegations as quickly as possible, Plaintiff then drafted a brief, bullet-point style summary of his interactions with Jane Roe on the night of his initiations.

291.     Plaintiff was in a three-hour lab when he received Crotty's email and rushed to provide some sort of narrative of the night just to "give a reference of the situation" prior to his formal interview.   Plaintiff was shocked and scared and simply wanted to give a quick overview of what happened, because he could not believe the allegations against him.

292.     Although Plaintiff is bright and academically successful, English is not his first language and as a result, he occasionally has trouble expressing himself precisely.

293.     Princeton's Title IX panel would subsequently utilize Plaintiff's off-the-cuff, rough draft outline of his recollection of events, as well as his troubles with English, to discredit Plaintiff in any way possible and to draw all conceivable inferences against him, for example, by concluding that his story had discrepancies when, in reality, they were small semantic differences.

294.     Mere minutes after Plaintiff received Crotty's email, Plaintiff was notified by the Tiger Inn president that he was banned from the club and not allowed on club premises.

295.     On or about February 26, 2018, prior to his initial interview, Plaintiff reviewed a list of lawyers provided by Princeton to students seeking potential representation. According to

---

[11] The notice included two initials to represent the complainant's name, but they did not match Jane Roe's initials.

Plaintiff's inquiries, none of the recommended lawyers could guide him through his Title IX process.

296.    Having not grown up in the United States, and with his parents living far away, with one still in Liberia, Plaintiff did not have any other contacts or a support system necessary to guide him through the challenging and confusing process of a Title IX investigation and adjudication.

297.    Moreover, the advisor provided by Princeton did nothing to protect Plaintiff's rights or substantively assist him, instead encouraging him to submit numerous written statements, knowing that his words could be prone to misinterpretation or confusion.

298.    Through the Title IX process, Plaintiff would eventually learn Roe's specific allegations against him.  According to Roe, she and Plaintiff engaged in consensual sexual intercourse when they first arrived at her room.  Roe claimed that no oral sex took place first – the parties went straight from kissing to vaginal penetration.  Roe claimed that after they had sex, Plaintiff asked if they could fool around more, and she said no.  She stated that Plaintiff then asked for a blow job and she said no.  She stated that Plaintiff then kneeled on the bed with his penis in her face.  Roe stated that "the next thing [she] knew," Plaintiff's penis was in her mouth for about three seconds until she shifted her head away.  Roe did not state that Plaintiff grabbed her head or physically forced his penis into her mouth.  Roe stated that Plaintiff then asked if they could have sex again.  Roe stated she did not respond yes or no.  Roe stated that Plaintiff then stood up, retrieved a condom, put it on, situated Roe's body in a sexual position, and engaged in intercourse.  Roe did not say "no" or move away from Plaintiff during this time, but told the panel it was nonconsensual.  Roe stated that this round of intercourse stopped after a bit, and she did not know whether Plaintiff ejaculated.  Roe stated that afterwards, they were

both on the bed, and Plaintiff began to digitally penetrate her vagina.  Again, Roe did not move away, tell Plaintiff to stop, or say no.  According to Roe, she told Plaintiff, as his fingers were inside her, "you are welcome to stay or leave, but nothing is happening."  Roe stated there was no intercourse after the digital penetration.  Plaintiff left shortly thereafter.

299.    Needless to say, Roe and Plaintiff's recollections of the evening, including everything from the timeline to the alleged sex acts and the order of events, were considerably disparate.

300.    There was no objective evidence presented to the panel to substantiate Roe's claims over Plaintiff's.  Thus, the case hinged on credibility.

### D. <u>Complaints and Collusion.</u>

301.    Shortly after Jane Roe initiated her Title IX complaint, she was contacted by fellow Princeton student, Mary Smith.[12]

302.    Mary Smith and Plaintiff had been involved in an intimate relationship the previous year; the relationship ended after Plaintiff discovered that Smith had a boyfriend at another school while she had been dating Plaintiff.

303.    After Smith and Plaintiff ended their relationship, Plaintiff spoke to several of Smith's other lovers/love interests, to tell them that Smith had a boyfriend and had been cheating on him.

304.    Needless to say, Smith did not appreciate Plaintiff's statements, and contact between the two became sporadic and unpleasant.

305.    Group messages between Smith and at least ten of her friends at the time indicate that Smith told numerous people Plaintiff was spreading rumors about her.  Her friends responded, "let's bully him" and suggested waiting outside his room to confront and harass

---

[12] Mary Smith is a pseudonym.

him.

306.    When Smith heard that Roe was initiating a Title IX case against Plaintiff, she offered to help bolster Roe's case.  Plainly, Smith saw Roe's case as an opportunity for revenge against Plaintiff.

307.    Screenshots of the text messages between Roe and Smith were provided to Princeton's Title IX office, which later provided carefully redacted versions to Plaintiff.

308.    In the messages, Smith told Roe "I wanted you to know I had a horrible experience with [Plaintiff] last year and . . . I'm here for any kind of support you need/want. He's a horrible person and I'm so glad something is being done."

309.    Jane Roe responded, "Hey.  I wanted to tell you the same thing in person. . . .  I wanted to reach out to you personally before Title 9 [sic] reaches out to you.  They look at 'his past' . . . "

310.    In the version of the messages provided to Plaintiff, Roe's sentence is then cut off at the bottom of the screen after the words "his past."  The next page picks up somewhere later in the conversation.

311.    Roe's message, and Princeton's careful redaction, indicate that Princeton's Title IX office may have offered to consider inappropriate evidence, and then sought to hide their misconduct by redacting that portion of the conversation from what was provided to Plaintiff.

312.    On the second page of messages provided to Plaintiff, Smith said again to Roe, "I will support you in any way I can."  Roe responded, "should I give you as a witness then?"

313.    Notably, Princeton's Title IX policy prohibits both consideration of past sexual history and character witnesses.  Yet, this is precisely what Roe and Smith were conspiring to present in order to make sure Plaintiff was found responsible.

314.   Plaintiff was only provided two, nonconsecutive pages of messages between Roe and Smith, even though it is clear from the context that Roe and Smith continued to discuss Plaintiff and Roe's Title IX case beyond what was provided to Plaintiff.

315.   Curiously, Princeton's Title IX investigation reports and final outcomes in both cases make no mention of the communication between Roe and Smith.  In other words, despite blatant evidence of witness tampering and collusion, Princeton's Title IX panel failed to punish either Roe or Smith, and failed to account for such behavior in its ultimate credibility findings and determination.

### E.  Princeton's Biased, Partial Investigations.

316.   At Plaintiff's initial interview with the Title IX panel, he explained everything about the evening in question—initiations, his intoxication level, the coercive atmosphere, and his hesitance to upset Roe for fear of being kicked out of TI.  Plaintiff expressly told the Panel he felt as if leaving TI with Roe was an obligation of initiations.

317.   The Panel asked Plaintiff for his intoxication level on a scale of one to ten, where zero is sober and ten is passed out from alcohol.  Plaintiff told the Panel he was a seven on intoxication, indicating pretty serious intoxication.  Princeton's Title IX panel would later state in their final report that Plaintiff's reported intoxication level was a "six," even though their own initial, written records properly had him reporting at a seven.   Princeton's "typo" thus coincidentally made it seem as if Plaintiff was more sober than he actually was.

318.   Plaintiff also told the Panel he was a nine on the intimidation scale, particularly after Roe had revealed that she knew considerable personal information about Plaintiff.

319.   All of these factors were common elements of TI initiations, of which Princeton was undoubtedly aware for many, many years.  However, Princeton failed to take any action

whatsoever with respect to TI or investigating their patent hazing of initiates, including Plaintiff.

320.    On information and belief, Princeton's Title IX panel did not refer the matter to any other Princeton office, nor reach out to any TI officer or TI's Graduate Board to inquire as to the recent initiations.

321.    On information and belief, Princeton simply ignored Plaintiff's report that TI had provided excessive alcohol to underage students, in addition to other impermissible hazing and sexual misconduct.

322.    A few days after his initial interview, on March 4, 2018, Plaintiff filed a formal cross-complaint against Roe for sexual assault, for sexual intercourse and oral sex without consent, by virtue of coercion/intimidation and Plaintiff's intoxication.[13]

323.    The response from Princeton's Title IX coordinator indicated the flippant nature of Princeton's response to allegations of abuse by a male student against a female student: "Thank you for letting me know. I will be back in touch later this week with an update on timing." There was no referral to victim's services, such as Princeton's SHARE office.

324.    Although Princeton's Title IX office superficially conducted a counter-investigation against Roe, it was clear that the Panel doubted Plaintiff's allegations from the start.

325.    Throughout the process, Plaintiff was treated as the guilty party and interrogated, rather then being treated as a potential victim and given a trauma-informed interview, like Roe was. His words were twisted and taken out of context, with Princeton

---

[13]  Plaintiff reported that the initial oral sex and intercourse were nonconsensual and coerced, but that over the course of the evening he became more comfortable and subsequently engaged in consensual intercourse.

exploiting his difficulties with certain linguistic nuances, rather than accommodating them.  He was provided with a procedural advisor, but not a sexual assault advocate.  Princeton's Title IX panel went to great lengths to record Roe's claimed emotional impact from the alleged incident, devoting over a page of their interview report to it, while pettily addressing Plaintiff's with a single sentence: "This situation has caused him stress."

326.    Despite Plaintiff reporting a high intoxication level and indicating that his condition contributed to his following Roe's directives, and that he was not in the right condition to consent, Princeton's Title IX panel stated that Plaintiff did not claim lack of capacity.

327.    By virtue of the Panel's questions and demeanor, and Princeton's treatment of Plaintiff throughout the Title IX process, it became clear to Plaintiff that the Panel simply did not believe that he, as a black male student, could be the victim of a sexual assault.

328.    Just a few days after Plaintiff filed his cross-complaint, Mary Smith filed her own Title IX complaint against Plaintiff, alleging sexual assault and intimate partner violence on the last night they slept together in 2017.

329.    On information and belief, Smith had never made such allegations about Plaintiff to anyone in the year since they broke up, up until Plaintiff filed his counterclaim against Roe.

330.    In response to Smith's complaint, Princeton assigned the very same panel that was handling Roe's claims—Crotty, Shueh, and White—to investigate and adjudicate Smith's claims.

331.    The existence of simultaneous cases against Plaintiff, being heard and decided by the same panel, greatly prejudiced Plaintiff in that it had the clear capacity to affect the

Panel's ability to view each case on its own merits.  Plainly, if the Panel found Plaintiff non-credible on some issue in one case, that perception would (or at least had the clear capacity to) carry over into the other case.

332.    Princeton's pursuit of simultaneous cases against Plaintiff by the same panel precluded Plaintiff from receiving a fair, unbiased, unprejudiced determination on the merits of each case individually.

333.    For example, in the course of the Smith investigation, the Panel found that Plaintiff was not credible with respect to a certain element of the case.  This is precisely the sort of cross-contamination that unfairly tainted Plaintiff's disciplinary proceedings, as it is unlikely the Panel would have been able to ignore its credibility determination on one case while evaluating the other.

**F.  <u>The Outcome.</u>**

334.     On May 11, 2018, Princeton's Title IX panel simultaneously issued its findings in the Roe case and the Smith case.

335.    With respect to Smith, Plaintiff was found not responsible for any violation.

336.    Notably, the Title IX panel's interview notes indicated several areas where they felt Plaintiff was untruthful or untrustworthy.   However, Plaintiff was able to produce considerable objective evidence rebutting Smith's claims, giving the panel no option but to find him not responsible.

337.    Specifically, Plaintiff was able to produce a text message from Smith after their last night together—the night of the alleged violent assault—wherein Smith thanked Plaintiff for a wonderful evening and specifically stated that the intercourse was "so sweet."

338.    Plaintiff   also   produced   text   message   records   indicating   Smith   had

redacted/manipulated text records that she had submitted to the Panel, including deleting a message she sent Plaintiff after they broke up, saying "I miss you."

339.    The Panel's interview notes from Smith's case indicate that were it not for the concrete records proving that Smith's claims were entirely fabricated, Princeton's Title IX Panel may have found Plaintiff responsible by virtue of their credibility assessments.

340.    Thus, even though Plaintiff was found not responsible in Smith's case, the fact that the same Panel was assigned to both cases resulted in a credibility assessment that inherently biased the Panel against Plaintiff in the Roe case.

341.    Moreover, despite patent evidence that Smith fabricated her entire case (likely in order to bolster Roe's claims against Plaintiff), and submitted doctored evidence in order to support her false claims, Princeton's Title IX panel did not pursue any disciplinary action against Smith, nor against Roe, nor did the Panel even acknowledge the misconduct in its final reports or credibility assessments.

342.    With respect to Roe's case, the Title IX Panel found Plaintiff responsible for non-consensual sexual penetration (the "Decision"). Specifically, the Panel found Plaintiff responsible for non-consensually placing his penis into Jane Roe's mouth and digitally penetrating her vagina. The Panel found Plaintiff not responsible for the alleged non-consensual intercourse with Jane Roe.

343.    The Panel found Jane Roe not responsible for both charges, concluding that "there was insufficient evidence to support the charges."

344.    Because Plaintiff and Roe had given considerably different versions of the events in Roe's room, and because there was no objective evidence as to what occurred in the room, the entire case rested on credibility.

345.     The Title IX Panel's doubts as to Plaintiff's credibility in the Smith case thus inherently, improperly, and prejudicially biased their evaluation of Plaintiff's credibility in the Roe case, depriving him of a fair and impartial adjudication.

346.     Moreover, despite concrete evidence of collusion and manipulation between Roe and Smith, Princeton refused to find Roe less credible.

347.     The Title IX Panel's final report in Roe's case perfectly encapsulated Princeton's response to claims of misconduct at the eating clubs for decades: it completely ignored it.

348.     Indeed, despite the highly relevant nature of the lead-up to Plaintiff's interactions with Roe, the Title IX Panel's final report began the fact summary as follows: "[Roe] and [Plaintiff] met on the dance floor following Tiger Inn initiations."

349.     The entire report then focused on the parties' competing claims about what happened in Roe's bedroom.  There was little to no acknowledgment of the hazing and coercion Plaintiff suffered in the hours leading up to their encounter.

350.     Instead, the Title IX Panel stated in a footnote that although Plaintiff told the Panel several times that he felt pressured to submit to Roe's advance by virtue of the initiations, the Panel discounted these repeated claims because, on one occasion, Plaintiff admitted he was not expressly told by TI that "hooking up" would be part of initiations.  The Panel thus concluded Plaintiff's claims of coercion were inconsistent and not credible.

351.     Shockingly, the Panel also reasoned that Plaintiff's claim of nonconsensual intercourse was less credible because the intercourse ended when he had an orgasm.

352.     As a result of the findings in Roe's case, Plaintiff was suspended from Princeton for two years, beginning May 27, 2018 (the "Sanction").

71

353.    On May 17, 2018, Plaintiff appealed the Decision in the Jane Roe case.

354.    On June 26, 2018, Princeton summarily denied Plaintiff's appeal and upheld the Decision and Sanction.

355.    Rather than substantively addressing the claims in Plaintiff's appeal, Princeton utilized a copy-and-paste form letter giving a general explanation that the Title IX investigative panel reviewed all evidence and made credibility determinations as it saw fit.

356.    Princeton's use of such a form letter indicates the appeals process is nothing but a rubber-stamp, to give the impression of a fair process when in reality, Princeton as a matter of pattern, routine, and practice, does not overturn the decisions of its Title IX panel, specifically with respect to finding male students and faculty responsible for violations.

357.    Plaintiff has exhausted all avenues for appeal under Princeton's relevant policies.  This lawsuit represents his only hope to right the wrongs occasioned by TI and Princeton's misconduct.

## IV.    AGREEMENTS, REPRESENTATIONS, COVENANTS AND WARRANTIES BETWEEN PLAINTIFF AND DEFENDANT PRINCETON.

358.    Upon Plaintiff's matriculation into Princeton, Plaintiff and Princeton became mutually bound by the Princeton University "Rules, Rights, Responsibilities" document (RRR), which contains Princeton's various policies on student conduct, discipline, and students' rights and responsibilities.  The RRR also contains Princeton's Sexual Discrimination and Sexual Misconduct Policy ("the Policy"), which is the applicable policy for Princeton's Title IX procedures.

359.    On information and belief, the RRR is updated and/or reissued each new school year.

360.    On information and belief, the RRR and/or the various policies contained therein,

are available online on the Princeton University website.

361.   The RRR constitutes and represents a contract between students and the University and, in particular, between Plaintiff John Doe and Defendant Princeton University.

362.   As with all contracts, the RRR inherently includes a covenant of good faith and fair dealing by the parties to the contract.

363.   According to the Policy, "Princeton University does not tolerate sex or gender discrimination, including sexual misconduct such as sexual harassment and sexual assault." RRR § 1.3.

364.   The Policy "governs the conduct of: University students, regardless of enrollment status . . . and third parties (i.e., non-members of the University community, such as vendors, alumni/ae, visitors, or local residents)" and "applies to conduct that occurs on University property (i.e., on campus) and in the local vicinity."  RRR § 1.3.2 (emphasis added).

365.   In that regard, "[a]ll actions by a member of the University community that involve the use of the University's computing and network resources from a remote location, including but not limited to accessing email accounts, will be deemed to have occurred on campus."  RRR § 1.33.2.

a.   In the instant case, communications about TI initiations were sent via University email, and, on information and belief, utilizing the University's network.

366.   The Policy applies to off-campus conduct that "may pose a safety risk on campus, have a continuing adverse effect or could create a hostile environment on campus." RRR § 1.3.2.

367.   The Policy definition of Sexual Harassment includes "[u]nwelcome or inappropriate conduct that does not fall under other forms of sexual misconduct, but that is

sexual and/or gender-based in nature. Examples may include public sex acts <u>or flashing</u>."

RRR § 1.3.3(2) (emphasis added).

368.   The Policy defines "consent" as:

> voluntary, informed, <u>un-coerced</u> agreement through words and actions freely given, which a reasonable person would interpret as a willingness to participate in mutually agreed-upon sexual acts. Consensual sexual activity happens when each partner willingly and affirmatively chooses to participate.  Indications that consent is not present include: . . . when duress is present; . . . and when a person is incapable of making an intentional decision to participate in a sexual act, which could include instances in which the person is in a state of incapacitation.

> RRR § 1.3.3(4) (emphasis added).

369.   In the context of the Policy,

> incapacitation is the state in which a person's perception or judgment is so impaired that the person lacks the cognitive capacity to make or act on conscious decisions. The use of drugs or alcohol can cause incapacitation. An individual who is incapacitated is unable to consent to a sexual activity. Engaging in sexual activity with an individual who is incapacitated (and therefore unable to consent), where a person knows or ought reasonably to have understood that the individual is incapacitated, constitutes sexual misconduct.

> RRR § 1.3.3(4).

370.   The Policy states that Princeton "has an obligation to make reasonable efforts to investigate and address complaints or reports of sex or gender discrimination, including sexual misconduct, whenever it becomes aware of such a complaint or report."  RRR § 1.3.

    a.   Princeton violated the Policy because it refused to investigate Plaintiff's claims of sexual harassment at TI.

    b.   Princeton violated the covenant of good faith by refusing to investigate Plaintiff's claims despite Princeton's knowledge of a history of sexual misconduct and harassment at TI, particularly associated with initiation hazing

and underage students.

371.    In determining whether certain conduct violates the Policy, "the University will consider the totality of the facts and circumstances involved in the incident, including the nature of the alleged conduct and the context in which it occurred." RRR § 1.3.2 (emphasis added).

a.  Princeton violated the Policy by failing and deliberately refusing to acknowledge the context in which Plaintiff and Jane Roe's sexual interactions occurred; specifically, by failing to appropriately acknowledge and consider the effects of the severe hazing Plaintiff was subjected to in the hours immediately preceding their interactions.

b.  Princeton violated the Policy by failing to acknowledge the highly competitive, coercive, and insular context of TI initiations, including the pressure to conform, comply, and do whatever the senior members say.

c.  Princeton violated the Policy by failing and deliberately refusing to acknowledge the context of Plaintiff's intoxication level at the time he met Roe, and specifically, the fact that Plaintiff, who was underage, was provided alcohol by TI upperclassmen and coerced into excessive drinking via drinking games and initiation rituals, a.k.a., hazing.

372.    The Policy "includes investigation and disciplinary procedures that will be followed in response to allegations of sex or gender discrimination, including sexual misconduct such as sexual harassment and sexual assault." RRR § 1.3.

a.  Princeton violated the Policy by failing to follow the proper procedures, as explained further below.

373.    According to the Policy, "[i]f the Title IX Coordinator determines that [a]

complaint or report would, if substantiated, constitute a violation of this policy, the Title IX Coordinator will . . . initiate an investigation." RRR § 1.3.10(2).

a. Princeton violated this policy because Plaintiff reported actions by TI members that would, if substantiated, constitute violations of the Policy, yet the Title IX coordinator failed to initiate an investigation.

374. Pursuant to the Policy, "[u]pon receipt of a complaint or report of a violation of this policy, the University will provide reasonable and appropriate interim measures designed to preserve the complainant's educational experience." RRR § 1.3.9. Such interim measures include "Rescheduling of exams and assignments" and "Change in class schedule." *Id.*

a. Princeton violated the Policy by failing to appropriately accommodate Plaintiff's academic schedule, even though he was a formal complainant against Jane Roe. Specifically, Princeton refused to permit Plaintiff to reschedule a final exam.

375. Pursuant to the Policy, "[t]he Title IX Coordinator will seek to complete the investigation and any resulting disciplinary process and provide notice of the outcome within 60 calendar days after receipt of the complaint or report," and the University "will notify the parties in writing of any extension of the timeframes for good cause, and the reason for the extension." RRR § 1.3.10(3).

a. Princeton violated the Policy because, on information and belief, the Title IX office received the complaint or report at least as early as February 20, 2018, when Ms. Crotty informed Plaintiff of Jane Roe's allegations. However, the Finding was not issued until May 11, 2018—eighty days later—and Plaintiff was never informed in writing of the reason for extension.

b. Notably, the Panel's final report issued with the Finding carefully avoided setting

forth the date the complaint was first received, and, in fact, Plaintiff was never provided a copy of the initial complaint or statement.

c.   On information and belief, Princeton routinely fails to complete its Title IX investigations within the designated timeframe and routinely fails to provide notice or just cause for such delays.

376.   According to the Policy, "[t]he University will seek to complete any appeal within 20 calendar days after receipt of the appeal."  RRR § 1.3.10(3).

a.   Princeton violated the Policy because Plaintiff submitted his appeal on May 17, 2018 and did not receive a decision until June 26, 2018—forty days later, double the time allotted for in the Policy.

377.   According to the Policy, "When the Title IX Coordinator receives a complaint or report alleging that a student violated this policy, the Title IX Coordinator will appoint a three-person investigative panel of administrators and/or outside investigators. . . . All panelists will have training in investigating and evaluating conduct prohibited under the policy.  The panelists will also be impartial and unbiased."  RRR § 1.3.12(1).

a.   Princeton violated the Policy because, on information and belief, the Panelists were improperly and inadequately trained, and were partial and biased.

b.   The Panelists were partial and biased by virtue of their involvement in unrelated, simultaneous investigations of allegations against Plaintiff.   In particular, Complainant Smith alleged violent and dangerous behavior by Plaintiff, which, although eventually revealed as fabricated, undoubtedly tainted the Panelists' view of Plaintiff during the crucial early stages of both investigations.

c.   The Panelists were poorly trained as evidenced by their conclusion that Plaintiff's

orgasm during intercourse was evidence of his consent, underscoring a lack of knowledge regarding basic understandings of sexual assault.

d. The Panelists were biased against Plaintiff as the male accused, and in favor of Roe as the female complainant, as evidenced by the Panel's intentional twisting of Plaintiff's words and its refusal to acknowledge patent credibility issues and misconduct by Roe, including her collusion with Smith to fabricate the second case, as well as Crotty's lackluster response to Plaintiff's complaint against Roe, and the Panel's heavy emphasis on the emotional toll on Roe, while all but ignoring the impact of the events on Plaintiff.

e. Moreover, because the Panelists served as both the investigators _and_ the adjudicators, they were undoubtedly biased by certain irrelevant and inadmissible evidence discovered during the investigatory phase. The whole point of excluding irrelevant statements from the final report is to prevent the adjudicators from being impacted by improper evidence. If the investigators and the adjudicators are one and the same, it is obvious that such statements have a dangerous and undeniable capacity to bias the Panel in the adjudicative phase.

378. The Policy states, "the panel will interview witnesses as necessary." RRR § 1.3.12(1).

a. Princeton violated the Policy by failing to interview witnesses who were present during initiations and could have shed light on Plaintiff's state of mind and intoxication level, as well as the general atmosphere.

b. Princeton violated the Policy by failing to interview witnesses such as the TI members designated to control the beer taps on the evening in question.

c.  Princeton violated the Policy by failing to interview other TI bickerees, whose identities Princeton could have easily discovered, to inquire as to the harassment reported by Plaintiff.

d.  Princeton violated the Policy by failing to interview the students with whom Plaintiff and Jane Roe were dancing just prior to their kiss on the dance floor.

e.  Princeton violated the Policy by failing to interview the TI bouncers and "safety" members whom Plaintiff reported seeing as he exited the club with Jane Roe.

f.  Yet, the Panel was more than happy to interview multiple witnesses who had no contemporaneous personal knowledge of the relevant events, whose testimony consisted entirely of hearsay from Roe, and who in fact gave conflicting stories of Jane Roe's claims, but were nonetheless interpreted as supporting her story.

379.  According to the Policy, "[t]he panel will prepare a case file of all interview summaries, witness statements, and other documents.  The file, redacted of personally identifiable information as necessary, will be shared with the complainant and the respondent." Further, each party will have the option to respond to the investigative file.  RRR § 1.3.12(1).

a.  The Policy, in and of itself, precludes Plaintiff from receiving a fair and impartial investigation and from being able to adequately respond to the investigation, as Princeton withheld the names and identifying information of the interviewed witnesses from Plaintiff.  Plainly, Plaintiff cannot adequately respond to witness statements if he is not told who the witnesses are.

b.  Making matters worse, on information and belief, Jane Roe knew the identity of all the interviewed witnesses.  In that regard, Princeton denied Plaintiff relevant information that Roe had access to, constituting unequal treatment and bad faith.

380.    According to the Policy, the Title IX Panel will "conduct an inquiry and determine, by a preponderance of the evidence" whether the Policy was violated.   (Section 1.3.12).

   a.   Princeton violated the Policy because it failed to conduct a genuine inquiry, particularly into the lead-up to the sexual activity between Plaintiff and Jane Roe, wherein Plaintiff was hazed and essentially forced to become intoxicated by TI members.

   b.   Princeton violated the Policy because the Findings were not supported by a preponderance of the evidence.

   c.   Princeton violated the Policy by ignoring—and worse, intentionally withholding from Plaintiff—evidence of patent collusion between the complainants, casting serious doubt on Roe's credibility.

   d.   Princeton violated the Policy by relying on sex and gender stereotypes and a poor understanding of sexual assault, rather than the objective facts of the case.  For example, when Plaintiff stated that he was extremely uncomfortable with Roe's advances, the Panel pressed Plaintiff on whether he was actually just uncomfortable with a female initiating sexual activity.

381.    According to the Policy, "[p]enalties will be determined based on the seriousness of the misconduct as compared to like cases in the past, and the student's previous disciplinary history (if any)."  RRR § 1.3.12.(2).

   a.   Princeton violated the Policy because it failed to take into account Plaintiff's clean disciplinary record.

382.    According to the Policy, all members of the Appeal Panel "will have training

regarding Title IX and prohibited conduct defined under this policy" and "will be impartial and unbiased."

    a.   Princeton violated the Policy because the use of generic, form language in the appeal denial, which, on information and belief, is routinely provided, verbatim, in response to male students' appeals, indicates the Appeal Panel is a rubber stamp process designed to protect the University's decisions, rather than a genuine, unbiased review.

383.   In addition to violations of the sexual misconduct policy, Princeton violated numerous other provisions of the RRR with respect to Plaintiff.

384.   RRR § 2.2.11, "Conduct at Prospect Avenue Clubs," provides:

> Standards of behavior by University students in the independent Prospect Avenue clubs are to conform with established standards in the University as a whole.  In particular, club members are to act with considerate regard for the rights, privileges, and sensibilities of others. . . .  Physical violence, intimidation of others, or offensive and disorderly behavior will not be tolerated in any club . . . .

385.   Princeton violated this policy by failing to address Plaintiff's complaint that he was repeatedly slapped on the back, hard, by senior members of TI as part of his initiations, in addition to being told to chug excessive amounts of alcohol in a short period of time, directed to strip, and had beer thrown on him.

386.   RRR § 1.6.2, "Alcoholic Beverages," provides:

> Members of the Princeton University community are expected to be acquainted with and to abide by both state and University regulations regarding the consumption of alcohol. . . .  The University alcoholic beverage policy is designed to be consistent with the laws of the State of New Jersey, which, in general, prohibit the consumption and serving of alcoholic beverages by and to persons under 21 years of age.

387.   RRR § 1.4.3 provides that "[v]iolations of federal, state, or local laws by members

of the University community . . . may trigger University disciplinary action regardless of where such violations occur, particularly if they are of a serious nature and clearly violate University standards of conduct."

388.    RRR § 2.2.9, "When are Princeton University students in violation of the alcohol policy?", makes clear that:

> [o]n campus and in the local vicinity, students <u>are in violation</u> of the University alcohol policy under any or all of the following circumstances:
>
> a. When participating in or organizing <u>an activity that encourages excessive drinking</u> (e.g., drinking games, pre-gaming with hard alcohol, <u>initiation activities, hazing</u>), as these acts can endanger the individual being served. <u>These are especially serious violations</u>.
>
> b. When the serving or consumption of alcohol contributes to behavior that (i) intimidates or harasses others; (ii) injures or threatens to injure others (e.g., driving under the influence of alcohol, assault); (iii) leads to the destruction of property; or (iv) infringes on the peace and privacy of others. These are especially serious violations.
>
> c. Violations of local ordinances or state laws by students may also be grounds for University disciplinary action, regardless of where such violations occur, if they clearly violate University standards of conduct.

389.    Princeton violated its obligations under the alcohol and off-campus misconduct policies by failing to enforce such policies against TI despite clear, reliable reporting by Plaintiff of numerous violations, including the provision of alcohol to underage students, and the initiation/hazing activities.

390.    Shockingly, Jane Roe <u>admitted to</u> participating in the provision of alcohol to underage bickerees at TI initiations, but was not subject to any discipline whatsoever for such violations, despite Princeton's apparent consideration of such behavior as an "especially serious offense."

391.   RRR § 2.2.7, "Hazing," states:

Any student shall have the right to be free of all activities which might constitute hazing, while attempting to become a member of, or maintain membership in, a fraternity, sorority, athletic team, student organization, eating club, or other organization. <u>Organizations, their members, and their prospective members are prohibited from engaging in or encouraging others to engage in activities that are defined as hazing.</u>

Hazing encompasses a broad range of behaviors that

a) may place another person in danger of bodily injury, or

b) that demonstrates indifference or disregard for another person's dignity or well-being.

Examples of hazing include but are not limited to the following:

- ingestion of alcohol, food, drugs, or any undesirable substance.

- participation in sexual rituals or assaults.

- emotionally or psychologically abusive or demeaning behavior.

- acts that could result in physical, psychological, or emotional deprivation or harm.

- physical abuse, e.g., whipping, paddling, beating, tattooing, branding, and exposure to the elements, or the threat of such behaviors.

- participation in illegal activities or activities prohibited by University policy.

392.   Princeton violated this policy by knowingly and deliberately failing to protect Princeton students, including Plaintiff, from hazing by TI.

393.   Princeton violated this policy because despite Plaintiff's express reporting of numerous activities that patently constitute hazing under the policy, Princeton refused to take any action whatsoever to investigate or hold TI members, including Jane Roe, accountable.

394.   Crucially, the RRR provides that "[w]here an activity amounts to hazing, <u>a</u>

person's consent to the activity is not a defense."

395.    RRR § 2.2.6, "University Ban on the Nude Olympics," is a particularly enlightening policy section, in that Princeton blatantly acknowledges a history of dangerous and alcohol-fueled activities.  That section of the RRR explains:

> For a number of years undergraduates, predominantly members of the sophomore class, gathered as a group in Holder Courtyard on the night of the first snowfall, virtually naked, and in an environment that included student alcohol abuse, underage drinking, lack of concern for the welfare of fellow students, and risk of harm to themselves, to other people, and to property. This gathering came to be known as the "Nude Olympics."
>
> In the spring of 1999, the president of the University and the Board of Trustees accepted the recommendation of the Committee on the Nude Olympics that this activity be banned, effective immediately, because of the severe health and safety risks posed by the event. The undergraduate student body is advised that they may not attempt to organize or engage in any activity that is perceived to perpetuate gatherings or events that contain or encourage some or all of the behaviors that have been associated with past Nude Olympics. These prohibitions apply to the campus, as well as to public and private property in the surrounding communities.
>
> Any undergraduate engaging in activity that, in the judgment of the dean of undergraduate students or a designee, could reasonably appear to others to perpetuate gatherings or events that contain or encourage such behaviors is subject to suspension from the University for a period of at least one year.

396.    Princeton violated this policy because Plaintiff explained that the new TI initiates were told to strip naked and run a lap around the TI building, in February.  This is precisely the kind of behavior that "could reasonably appear to others to perpetuate" or "encourage some or all of the behaviors that have been associated with past Nude Olympics."   Yet, once again, Princeton refused to conduct any genuine investigation into this initiation ritual at TI.

**V.    PLAINTIFF'S DAMAGES.**

397.    As a direct and proximate result of TI's failure to properly implement safety

regulations and to uphold its own code of conduct and applicable laws, Plaintiff was hazed and subjected to physical abuse, sexual harassment, humiliation, and sexual assault.

398.    As a direct and proximate result of Princeton's biased, unlawful, and improper conduct, an erroneous finding that Plaintiff engaged in Non-Consensual Sexual Penetration has been made part of Plaintiff's records, and his undergraduate degree has been delayed by two years as a result of the suspension.

399.    As a direct and proximate result of Princeton's biased, unlawful, and improper conduct, Plaintiff was not treated equally to a similarly situated female student, Jane Roe, and as a result, Plaintiff's assailant has faced no consequences for her actions.

400.    As a direct and proximate result of Princeton's biased, unlawful, and improper conduct, Plaintiff was subjected to sexual harassment and a hostile environment by virtue of TI initiations, which Princeton has known about for many, many years and deliberately refused to address.

401.    As a result of Princeton's deliberate indifference, Plaintiff's harassment by other Princeton students went unaddressed and unpunished.

402.    On information and belief, the two-year suspension is noted on Plaintiff's transcript.

403.    Plaintiff's records may be released to educational institutions and employers to whom Plaintiff applies, substantially limiting his ability to gain acceptance to graduate school, or to secure future employment.

404.    By improperly delaying Plaintiff's degree and placing a permanent notation on his college transcript, Princeton has damaged Plaintiff's future education and career prospects. Specifically, as a result of Princeton's actions, Plaintiff will be forced to disclose and explain to

potential employers and any graduate school to which he may opt to apply that he was disciplined by Princeton for sexual misconduct.

405.    In the wake of the powerful #metoo movement, schools and employers will not be clamoring to hire or admit someone who has been found responsible for sexual assault. And, even if Plaintiff's potential graduate school or employer sees his severely belated degree and does not ask about it, they will likely presume that Plaintiff failed to meet all of the academic requirements for a timely graduation, again placing him at a severe disadvantage.

406.    Due to Princeton's biased, unlawful, and improper conduct, Plaintiff was treated as a perpetrator and presumed guilty from the start.

407.    Due to Princeton's biased, unlawful, and improper conduct, Plaintiff has been falsely labeled as a perpetrator of sexual assault.

408.    Due to Princeton's biased, unlawful, and improper conduct, Plaintiff's academic file is now marred by a false and baseless finding of sexual misconduct, and the Sanction is listed on Plaintiff's transcript.

409.    Due to Princeton's biased, unlawful, and improper conduct, Plaintiff has suffered and will continue to suffer ridicule, reputational damage, physical harm, mental anguish, emotional harm, economic loses, and damage to his future educational and career prospects.

### AS AND FOR A FIRST CAUSE OF ACTION

**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* -
Erroneous Outcome
(Against Princeton)**

410.    Plaintiff John Doe repeats and re-alleges each and every allegation above as if

fully set forth herein.

411.   Title IX of the Education Amendments of 1972 provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

412.   Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant Princeton University.

413.   On information and belief, Princeton receives federal funding, including in the form of federal student loans given to students, and is subject to the provisions of Title IX.

414.   Title IX is enforceable through a private right of action.

415.   Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (2018); 28 C.F.R. § 54.135(b) (2018).

416.   The "prompt and equitable" procedures that a school must implement include, at a minimum: "[n]otice . . . of the procedure, including where complaints may be filed; [a]pplication of the procedure to complaints alleging harassment; . . . [a]dequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; . . . [and] [d]esignated and reasonably prompt timeframes for the major stages of the complaint process."  Dep't of Ed., *Office for Civ. Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (Jan. 19, 2001), at 20.

417.    According to the 2001 Guidance, the procedures adopted by a school covered by Title IX must accord "due process to both parties involved." *Id.* at 22.

418.    According to the 2001 Guidance, schools are obligated under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes 'alleged sexual assaults.'" *Id.* at 21.

419.    To succeed on an erroneous outcome claim under Title IX, a plaintiff must demonstrate: (1) a flawed proceeding, which led to an erroneous outcome; and (2) gender was a motivating factor behind the erroneous outcome.

420.    An erroneous outcome occurred in this case because Plaintiff was subjected to a blatantly flawed proceeding and erroneously found to be responsible for violating Princeton's sexual misconduct Policy, and gender was a motivating factor behind this erroneous outcome.

421.    The proceedings were flawed and caused an erroneous outcome because, by way of example and not limitation:

   a. From the start, the investigation was slanted in favor of the Jane Roe. Roe's story was deemed credible from the beginning and given more weight in the final analysis and determination of what occurred that night.  Princeton ignored blatant, material evidence of collusion between Roe and Smith when evaluating Roe's credibility;

   b. Princeton failed to conduct a thorough investigation, in that the Panel declined to interview material witnesses from TI initiations and the start of Roe and Plaintiff's interactions, choosing instead to rely on witnesses who had no personal knowledge and were simply repeating Roe's inconsistent narrative;

c. Princeton failed to conduct a thorough investigation, in that it did not even request copies of the surveillance footage from TI, which Princeton knew or had reason to know existed, based on prior publicized issues at TI that referenced surveillance video inside the club;

d. Princeton improperly assigned the same Panel to investigate unrelated claims against Plaintiff, causing material prejudice and bias;

e. Princeton's improper assignment of both cases to the same Panel caused improper and unacceptable cross-contamination—indeed, the Panel's report in the Smith case referred to Plaintiff as "Cross-Complainant", which he was in the Roe case, not the Smith case.  Further, the Panel's investigation report in the Roe case referred to an interview with a "Student 12."  On information and belief, Student 12 was a witness in the Smith case, not the Roe case.  This blatant evidence of confusion and cross-contamination between the investigations precluded Plaintiff from receiving an unbiased, impartial process;

f. The Panel deliberately twisted Plaintiff's words and exploited his difficulties with English in order to damage his credibility and bolster Roe's claims;

g. The Panel actively discouraged Plaintiff's narrative against Roe, asking him repeatedly whether he truly believed that sleeping with Roe was related to his TI membership (which he repeatedly stated he did believe, until badgered by the Panel into equivocating on the matter);

h. The Panel ignored clear evidence of coercion and incapacity, instead siding with the female student based on nothing more than her word;

i. The Panel utterly ignored material testimony given by Plaintiff, including the

hazing and initiation rituals, the compelled drinking and nudity, and the directive by TI members to do whatever the upperclassmen said;

j.   The Panel treated Plaintiff as the assailant even after he filed cross-claims against Roe;

k.   On information and belief, Princeton did not respond to Plaintiff's cross-complaint as it did to Roe or other female complainants;

l.   The Panel asked leading questions in order to discredit Plaintiff, which they did not do to Roe;

m.   The Panel withheld witness identities from Plaintiff, although Roe knew the identity of the witnesses;

n.   The Panel withheld Roe's initial report from Plaintiff, thereby precluding him from being able to address potential inconsistencies between her initial report and her subsequent interviews;

o.   The Panel was improperly trained and as a result, drew ignorant and baseless conclusions, including that Plaintiff must have consented to intercourse because he had an orgasm; and

p.   The Appeals Panel failed to give Plaintiff's appeal a genuine review, instead relying on a cut-and-paste form letter which, on information and belief, it routinely uses in denying male respondents' appeals.

422.   Particular circumstances suggest that gender bias was a motivating factor behind the flawed proceedings and erroneous findings.   These circumstances include, by way of example and not limitation:

a.   The pressure imposed by the 2014 OCR resolution, including the fear of loss of

federal funds, as well as the fear of added financial liability such as reimbursing tuition for aggrieved female students, as well as subsequent complaints and OCR investigations into Princeton's alleged failure to sufficiently prosecute and punish male students/faculty accused of sexual misconduct;

b. Internal pressure from the student body and/or the media after years of harshly criticizing Princeton for its alleged failure to sufficiently prosecute and punish male students/faculty accused of sexual misconduct, including widespread student outrage in 2017 and 2018. As Princeton's own school paper put it, "[t]he University, with its $25.9 billion dollar endowment, well-connected alumni, and strongly-opinionated student body, would likely face severe public backlash, as it has in the past, if it rolled back its Title IX protections for students. With a faculty-student sex scandal in 2017 and two others in 2014, the University's public image has the potential to be tainted more by lax Title IX enforcement . . . ." Jasman Singh, *Title IX Changes Are Going to Hurt Those that Need the Enforcement the Most*, The Daily Princetonian (Nov. 28, 2018)—notably, each of the scandals identified in the article involved male respondents;

c. The institutionalized bias against male respondents and in favor of female complainants, as evidenced by, among other things, the campus survey results indicating sexual misconduct complaints against female respondents are not prosecuted as often or as harshly as complaints against male respondents.

d. The institutionalized bias embracing gender stereotypes, such as female victims and male assailants, as evidenced by Princeton's offering certain sexual assault self-defense courses exclusively to female students;

e.   Princeton's refusal to hold Roe accountable for hazing and alcohol policy violations at TI;

f.   Princeton's refusal to subject Smith to any discipline whatsoever for filing a blatantly false and fabricated report, submitting fabricated evidence to the Panel, and expressly agreeing to file her complaint in order to help bolster Roe's case against Plaintiff;

g.   Princeton's refusal to reprimand Roe in any way for colluding with Smith;

h.   Princeton's unequal treatment of Roe as the complainant versus Plaintiff as the complainant;

i.   Princeton's refusal to conduct any genuine investigation that could reveal exculpatory evidence, for example, failing to interview witnesses and review security footage;

j.   Princeton's absolute refusal to investigate claims of hazing and sexual harassment against Plaintiff by TI members;

k.   The Panel's disparate treatment of Plaintiff and Roe, where Plaintiff was interrogated and treated as guilty from the start, whereas Roe was treated as a victim and considered truthful from the start;

l.   The Panel's refusal to acknowledge facts and events that seriously challenged Roe's credibility, while nitpicking every statement Plaintiff made throughout the process in order to find him less credible;

m.   Princeton's refusal to disclose to Plaintiff material information gathered during the investigation, to which Roe had access; and

n.   Princeton's failure to afford Plaintiff the presumption of innocence, as such

would require Princeton to view equivocal evidence in favor of Plaintiff, which it did not do.

423.    On information and belief, Princeton's mishandling of the Complaint was informed by internal institutional pressure, ongoing OCR investigations, Princeton's 2014 settlement with the OCR, and the threat of rescission of federal funds.

424.    On information and belief, Princeton has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed on male students, while not making comparable efforts with respect to allegations of sexual violence and abusive conduct made against female (and gender non-binary) students.

425.    Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

426.    This unlawful discrimination in violation of Title IX caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

427.    As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Princeton to: (i) reverse the findings and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his educational/academic/disciplinary file and/or transcript; (iv) permanently destroy any record of Jane Roe's complaint; (v) immediately reinstate Plaintiff as an enrolled student in good standing at Princeton; and (vi) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed.

## AS AND FOR A SECOND CAUSE OF ACTION

**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*. -
Selective Enforcement
(Against Princeton)**

428.    Plaintiff John Doe repeats and realleges each and every allegation above as if fully set forth herein.

429.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

430.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant Princeton.

431.    On information and belief, Princeton receives federal funding, including in the form of federal student loans given to students, and is subject to the provisions of Title IX.

432.    Title IX is enforceable through a private right of action.

433.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (2018); 28 C.F.R. § 54.135(b) (2018) (emphasis added).

434.    The "prompt and equitable" procedures that a school must implement include, at a minimum: "Notice . . . of the procedure, including where complaints may be filed; Application of the procedure to complaints alleging harassment . . .; Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; Designated and reasonably prompt timeframes for the major stages of the complaint process;

Notice to the parties of the outcome of the complaint; and [a]n assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects . . . ." Dep't of Ed., Office for Civ. Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (Jan. 19, 2001), at 20.

435.    According to the 2001 Guidance, schools are obligated under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes 'alleged sexual assaults.'" *Id.* at 21.

436.    To succeed on a selective enforcement claim, a plaintiff must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the University.

437.    Plaintiff and Roe were similarly situated in that both students alleged actions by the other that could constitute Nonconsensual Sexual Penetration if substantiated.

438.    Plaintiff and Smith were similarly situated in that both were students involved in a Title IX investigation with an equal obligation to be truthful to the Title IX committee.

439.    Selective enforcement occurred in this case because Roe and Smith were similarly situated female students who was treated more favorably by Princeton.  By way of example, and not limitation:

      a.    On information and belief, when Roe disclosed her complaint to the University, she was provided resources for victims of sexual assault.  Yet, when Plaintiff reached out to Princeton to file his cross-complaint, the first response he received was a two-sentence administrative response: "Thank you for letting me know. I will be back in touch later this week with an update on timing;" there was no referral to victim's services, such as SHARE;

b.  The Panel refused to address and acknowledge serious policy violations by Roe, including her: collusion with another complainant—comprising both dishonest behavior in the process and retaliation, as Smith's complaint was filed within days of Plaintiff's complaint against Roe—as well as Roe's participation in hazing activities, and her admitted provision of alcohol to underage students at TI;

c.  The Panel refused to address and acknowledge serious policy violations by Smith, including her blatant fabrication of her claims in order to retaliate against Plaintiff for filing his claim against Roe;

d.  The Panel refused to address and acknowledge serious policy violations by Smith, including her provision of intentionally altered and/or fabricated evidence in order to support her false claims;

e.  The Panel asked Plaintiff leading questions and distorted his responses in order to exonerate Roe;

f.  The Panel interpreted any vague or slightly grammatically inconsistent statements by Plaintiff as material deceptions, despite his obvious lack of fluidity in English, while ignoring or writing off inconsistencies in Roe's statements;

g.  The Panel took Roe's claims at face value, but nitpicked everything Plaintiff said or did in order to find inconsistencies;

h.  The Panel went to great lengths to record Roe's claimed emotional impact from the alleged incident, devoting over a page of their interview report to it, while pettily addressing Plaintiff's with a single sentence: "This situation has caused him stress;" and

i.  The Panel entirely ignored the events leading up to the sexual interactions

96

between Plaintiff and Roe in making its final determination, despite Plaintiff's statements that he was: (i) told to do whatever the upperclassmen said; (ii) told to go along with everything, even if it seemed "weird;" (iii) provided excessive amounts of alcohol, despite being underage, and told to chug beers on command, resulting in heavy intoxication; (iv) told to strip; (v) physically assaulted; (vi) sexually harassed; (vii) implicitly told not to report; (viii) approached by an older TI member (Roe), while alone, specifically asked if he was a sophomore, and then kissed unexpectedly when he answered "yes," giving the clear impression that the kiss was part of initiations; (ix) told by the same TI member to get his clothes and follow her; (x) led away from initiations, while heavily intoxicated and extremely scared and intimidated; and (xi) told by Roe she knew considerable personal details about him, and was responsible for getting him into the club.   Yet, Princeton deliberately left all of this information out of the final report, instead simply stating that Plaintiff and Roe met after TI initiations, and stated in conclusory fashion that there was no evidence of coercion or incapacitation.

440.   Princeton also imposed an unduly harsh sanction, which was motivated by Plaintiff's gender.  Princeton's explanation for imposing the Sanction was based largely upon: (i) the Panel's finding that Roe did not consent, which is simply an element of the violation; (ii) the panel's admonishment that Plaintiff's intoxication was not a mitigating factor; and (iii) Princeton's claim that "similar" cases in the past had resulted in a two-year suspension.

      a.   Princeton failed to account for Plaintiff's spotless disciplinary record, as well as the context surrounding the events in question; and

      b.   On information and belief, female (and gender non-binary) students accused of

sexual misconduct at Princeton are found responsible for lesser violations, and given lesser sanctions than male students accused of sexual misconduct, as indicated by campus survey responses.

441.    Particular circumstances suggest that gender bias was a motivating factor behind Princeton's selective enforcement of the Policy. These circumstances include, by way of example and not limitation:

a.  The pressure imposed by the 2014 OCR resolution, including the fear of loss of federal funds, as well as the fear of added financial liability such as reimbursing tuition for aggrieved female students, as well as subsequent complaints and OCR investigations into Princeton's alleged failure to sufficiently prosecute and punish male students/faculty accused of sexual misconduct;

b.  Internal pressure from the student body and/or the media after years of harshly criticizing Princeton for its alleged failure to sufficiently prosecute and punish male students/faculty accused of sexual misconduct, including widespread student outrage in 2017 and 2018.  As Princeton's own school paper put it, "[t]he University, with its $25.9 billion dollar endowment, well-connected alumni, and strongly-opinionated student body, would likely face severe public backlash, as it has in the past, if it rolled back its Title IX protections for students. With a faculty-student sex scandal in 2017 and two others in 2014, the University's public image has the potential to be tainted more by lax Title IX enforcement . . . ."  Jasman Singh, *Title IX Changes Are Going to Hurt Those that Need the Enforcement the Most*, The Daily Princetonian (Nov. 28, 2018). Notably, each of the scandals identified in the article involved male respondents;

c.  The institutionalized bias against male respondents and in favor of female complainants, as evidenced by, among other things, the campus survey results indicating sexual misconduct complaints against female respondents are not prosecuted as often or as harshly as complaints against male respondents.

d.  The institutionalized bias embracing gender stereotypes, such as female victims and male assailants, as evidenced by Princeton's offering of sexual assault self-defense courses exclusively to female students;

e.  Princeton's refusal to hold Roe accountable for hazing and alcohol policy violations at TI;

f.  Princeton's refusal to subject Smith to any discipline whatsoever for filing a blatantly false and fabricated report, submitting fabricated evidence to the Panel, and expressly agreeing to file her complaint in order to help bolster Roe's case against Plaintiff;

g.  Princeton's refusal to reprimand Roe in any way for colluding with Smith; and

h.  Princeton's unequal treatment of Roe as the complainant versus Plaintiff as the complainant.

442.  On information and belief, Princeton has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed on male respondents, while not making comparable efforts with respect to allegations of sexual violence and abusive conduct made against female/non-male students and/or by male complainants.

443.  Based on the foregoing, Princeton selectively enforced its policies as between similarly situated male and female students.

444.  This unlawful discrimination in violation of Title IX caused Plaintiff to sustain

substantial injury, damage, and loss, including, but not limited to, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

445.    As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Princeton to: (i) reverse the findings and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his educational/academic/disciplinary file and/or transcript; (iv) permanently destroy any record of Jane Roe's complaint; (v) immediately reinstate Plaintiff as an enrolled student in good standing at Princeton; and (vi) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed.

### AS AND FOR A THIRD CAUSE OF ACTION
**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.***
**Deliberate Indifference**
**(Against Princeton)**

446.    Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

447.    Title IX of the Education Amendments of 1972 provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

448.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant Princeton University.

449.     On information and belief, Princeton receives federal funding, including in the

form of federal student loans given to students, and is subject to the provisions of Title IX.

450.    Title IX is enforceable through a private right of action.

451.    A recipient of federal funding, such as Princeton, violates Title IX if the recipient is "deliberately indifferent" to known acts of student-on-student harassment which are severe, pervasive, and objectively offensive and interfere with the student's enjoyment of their education and the benefits thereof.

452.    Deliberate indifference is evidenced by a response that is clearly unreasonable in light of known circumstances.

453.    Princeton was deliberately indifferent to reports of harassment and assault by TI members at TI initiations, of which Princeton was well aware both historically and specifically with reference to Plaintiff's initiation.

454.    The eating clubs at Princeton University, and specifically the Tiger Inn, have a long, documented, well-known history of sexual harassment and sexual misconduct, frequently fueled by excessive consumption of alcohol and the provision of alcohol to underage students.

455.    Princeton had actual knowledge of these long-standing, ongoing issues by virtue of Princeton's published responses to various news articles specifically addressing these issues.

456.    Princeton had further notice of the habitual, constant, and ongoing issues of sexual harassment at the eating clubs by virtue of numerous written reports of campus committees and groups, which included Princeton staff/administrators, urging the school to take more action to prevent "dangerous drinking and other dangerous, demeaning and dehumanizing behaviors."

457.    As described in detail above, in the years leading up to Plaintiff's initiation, numerous TI officers were forced to resign after numerous instances of insufficient safety and

101

allegations of sexual assault and harassment at TI and by TI members and officers, including the wide-scale distribution of a photograph of a sex act that, in itself, on information and belief, was reported as a sexual assault.

458.    These events led to the vandalizing of the front walls of TI with the phrase "RAPE HAVEN."  This vandalism, and the event that spurned it, was widely covered in the media and included responses from Princeton acknowledging the situation.

459.    Despite decades of well-documented issues at TI, and despite recommendations by its own task forces calling for more oversight and action to protect Princeton students from the known harassment taking place at the eating clubs, Princeton has failed to take any substantive remedial action, subjecting class after class of Princeton students, including Plaintiff, to harassment.

460.    In fact, Princeton acknowledges and relies upon its hands-off approach in order to abdicate itself from any responsibility for the offenses at the eating clubs, which is a complete farce given that the eating clubs: (i) are subsidized and administratively supported by Princeton; (ii) utilize Princeton resources; (iii) cater exclusively to Princeton students; and (iv) provide meal options to two-thirds of Princeton's students and control the vast majority of the social scene.

461.    Because the eating clubs provide the majority of the social activities for Princeton students, Princeton students—like Plaintiff—are essentially forced to endure harassment in order to fully enjoy the benefits of student life at Princeton.

462.    Indeed, despite Princeton's constant professions that the eating clubs are separate corporate entities, Princeton promotes the eating clubs to new and prospective students, and the RRR contains policies that expressly apply to the eating clubs—although they are not genuinely

enforced.

463.    Princeton's disingenuous and inconsistent pattern of behavior—purporting to protect students in the eating clubs, while simultaneously denying responsibility for protecting students in the eating clubs—displays deliberate indifference to known instances of severe and pervasive harassment.

464.    Indeed, even though Princeton offers training to the eating clubs via SHARE, on information and belief, Princeton has never <u>required</u> specific training or safety measures to be implemented at the clubs.

465.    On information and belief, despite the allegedly separate structures of the eating clubs and Princeton, Princeton could easily impose safety requirements by refusing to subsidize the eating club meal plan without compliance.

466.    Furthermore, Princeton is well aware that many eating club members are hesitant to report incidents for fear of reprisal. *See* Anna Wolcke, *Behind Closed Doors: How Princeton's Administration Is Turning a Blind Eye to Serious Safety Issues in Its Secret Bar District*, Nassau Weekly (Feb. 17, 2019).  Princeton could easily remedy this by requiring eating clubs to provide anonymous surveys to their new members that will be delivered directly to the Title IX office.

467.    Princeton does not take any genuine, effective measures to encourage reporting because, in reality, Princeton benefits from the insular nature of the clubs, preferring for matters to be dealt with internally (or not at all), rather than having to address the issues directly and damage Princeton's reputation.

468.    Princeton's reliance on the eating clubs' self-governance structure is equally negligent; Hap Cooper, the graduate advisor for TI, was the president of the 21 club and has

repeatedly sought to protect TI's reputation over protecting TI's vulnerable members.

469.    Moreover, TI's own "safety czar" was forced to step down for failing to ensure safety at the club, while the club's appointed sober monitors end up drinking more than the students they are supposed to watch, and the hired bouncers are themselves convicted criminals and alleged perpetrators of some of the most consistent harassment.

470.    As a result of Princeton's intentional, deliberate, knowing, institutional neglect of decades of reported harassment and assault at the eating clubs, and specifically, at TI, Plaintiff was subjected to sexual harassment and assault, by numerous TI members, at his TI initiation.

471.    The harassment and assault to which Plaintiff was subjected was so severe as to interfere with his education and benefits of enrollment at Princeton.  Not only did Plaintiff undergo a stressful and disruptive Title IX process—during which Princeton refused to appropriately accommodate his academic needs—his assailant was found not responsible and instead, <u>Plaintiff</u> was suspended from Princeton.

472.    In addition to Princeton's historical and institutional deliberate indifference, Princeton was specifically deliberately indifferent to the harassment that Plaintiff reported to the Title IX office.

473.    Plaintiff told Princeton's Title IX office that while at TI, he was made to strip, physically abused, and flashed by naked and half-naked members.  Notably, flashing is expressly included in Princeton's definition of sexual harassment.

474.    Yet, Princeton took no action whatsoever in response to Plaintiff's report.

475.    Princeton's failure to take action on a report of sexual harassment was a clearly unreasonable reaction, constituting deliberate indifference in violation of Title IX.

476.    On information and belief, Tiger Inn has surveillance cameras inside the club,

meaning Princeton could have easily ascertained the identity of the alleged wrongdoers, and the truth of Plaintiff's statements.  Instead, Princeton chose, as always, to bury its head in the sand.

477.    Moreover, Princeton failed to appropriately and adequately respond to Plaintiff's complaint against Roe for sexual assault.

478.    Although Princeton superficially included Plaintiff's counter-claim into their report in the case involving Roe, Princeton deliberately, knowingly, and intentionally excluded Plaintiff's reports of hazing, intoxication, coercion, and intimidation by Roe from its ultimate decision, failing to even address the actions and atmosphere that led to Plaintiff's assault.

479.    As a result of Princeton's inadequate and biased investigation, Plaintiff's assailant, Jane Roe, was found not responsible, despite admitting to participating in initiations and contributing to the behavior that Plaintiff found intimidating and coercive.

480.    As a result of Princeton's unreasonable reaction to known reports of severe and pervasive sexual harassment and assault, Plaintiff was deprived the benefits of his education at Princeton.

481.    Princeton thus violated Title IX by virtue of deliberate indifference to student-on-student harassment.

482.    As a result of Princeton's unlawful and improper actions and inactions, Plaintiff suffered damages, including, but not limited to: physical assault, sexual assault, emotional harm, mental anguish, reputational harm, diminished educational career opportunities, and other economic losses and damages.

483.    As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Princeton to: (i) reverse the findings and sanction regarding Jane

Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his educational/academic/disciplinary file and/or transcript; (iv) permanently destroy any record of Jane Roe's complaint; (v) immediately reinstate Plaintiff as an enrolled student in good standing at Princeton; (vi) conduct a genuine investigation into Plaintiff's claims of assault and harassment at TI; and (vii) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed.

### AS AND FOR A FOURTH CAUSE OF ACTION
**Common Law Due Process:**
**Fundamental Fairness in School Disciplinary Proceedings**
**(Against Princeton)**

484.    Plaintiff John Doe repeats and realleges each and every allegation above as if fully set forth herein.

485.    New Jersey courts recognize that private school students facing disciplinary actions, up to and including expulsion, are entitled to a disciplinary process that: (i) adheres to the school's established standards, <u>and</u> (ii) is "fundamentally fair," and that any findings must be based on sufficient evidence. *See Hernandez v. Don Bosco Preparatory High*, 322 N.J. Super. 1, 21 (App. Div.), *certif. denied*, 162 N.J. 196 (1999).

486.    In the instant case, Princeton's disciplinary process neither conformed to its established procedures nor satisfied principles of fundamental fairness nor relied on sufficient evidence.

487.    As described in Section IV, *supra*, Princeton violated numerous provisions of the RRR in investigating and adjudicating Roe's and Smith's claims against Plaintiff, as well as failing to adequately investigate or fairly adjudicate Plaintiff's claims against Roe, and Plaintiff's reports of hazing and sexual harassment at TI.

488.    Moreover, Princeton's use of a single Panel to simultaneously investigate two unrelated claims against Plaintiff, as well as to adjudicate both, resulted in a process that was fundamentally unfair, as the Panel was undoubtedly tainted in its view of Plaintiff and his credibility by virtue of the dual investigations.

489.    Likewise, Princeton's refusal to conduct a proper investigation including interviewing of witnesses and/or review of security footage, in addition to its withholding of witness identities that were known to Roe, prevented Plaintiff from being able to fully defend himself, resulting in a process that was fundamentally unfair.

490.    In addition, the Finding did not accord with the appropriate burden of proof, and was not based upon sufficient credible evidence in the record.

491.    Princeton's deficient "investigation", coupled with, among other things, its violation of numerous provisions of the RRR, resulted in a disciplinary process that was fundamentally unfair and wrongfully deprived Plaintiff of his education, to which he was entitled as a student who paid tuition to Princeton.

492.    Princeton's fundamentally unfair, unsupported, and inappropriate actions and omissions caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

493.    As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Princeton to: (i) reverse the findings and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his educational/academic/disciplinary file and/or transcript; (iv) permanently

destroy any record of Jane Roe's complaint; (v) immediately reinstate Plaintiff as an enrolled student in good standing at Princeton; (vi) conduct a genuine investigation into Plaintiff's claims of assault and harassment at TI; and (vii) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed.

## AS AND FOR A FIFTH CAUSE OF ACTION
**Breach of Contract**
**(Against Princeton)**

494.    Plaintiff John Doe repeats and re-alleges each and every allegation above as though fully set forth herein.

495.    At all times relevant hereto, a contractual relationship existed between Plaintiff and Princeton through Princeton's dissemination of the RRR and policies and procedures governing the student disciplinary system, including but not limited to the Policy, and Plaintiff's tuition payments and other consideration, such as compliance with the RRR and relevant policies.

496.    As described in Section IV, *supra*, Princeton violated numerous provisions of the RRR in investigating and adjudicating Roe's and Smith's claims against Plaintiff, as well as failing to adequately investigate or fairly adjudicate Plaintiff's claims against Roe, and Plaintiff's reports of hazing and sexual harassment at TI.

497.    As a result of the direct, proximate, and foreseeable consequences of Princeton's breaches, Plaintiff sustained substantial injury, damage, and loss, including, but not limited to, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

498.    Thus, Plaintiff is entitled to damages in an amount to be determined at trial, plus

punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A SIXTH CAUSE OF ACTION
### Breach of Implied Contract/Quasi Contract
### (Against Princeton)

499.     Plaintiff John Doe repeats and re-alleges each and every allegation above as though fully set forth herein.

500.     Plaintiff paid Princeton sums of money for his education, and in return, Princeton was to provide Plaintiff with access to its undergraduate degree program and relevant protections and assurances under Princeton's policies, including the RRR and the Policy.

501.     Plaintiff's enrollment in, and attendance of classes at Princeton created in Plaintiff an expectation that he would be allowed to timely continue his course of study until he earned his degree from Princeton on his expected degree date June 2020.

502.     Through its promotional materials, contracts, and policies, including the RRR, upon which Plaintiff relied, and in exchange for which Plaintiff paid tuition, Princeton provided certain assurances to Plaintiff, including that disciplinary matters will be handled in a certain fashion, and that students will not be sanctioned or restricted from Princeton arbitrarily, unfairly, or without just cause.   Accordingly, an implied or quasi-contractual relationship existed between Plaintiff and Princeton under which each party owed the other certain duties.

503.     Under the implied/quasi-contract between Plaintiff and Princeton, Princeton had a duty not to suspend, expel, or otherwise discipline Plaintiff for disciplinary misconduct arbitrarily, capriciously, maliciously, discriminatorily, or otherwise in bad faith or in violation of its posted policies and procedures.

504.     Under the implied/quasi contract between Plaintiff and Princeton, Princeton had a duty to investigate Plaintiff's reports of hazing, assault, and harassment, which it failed and/or

refused to do.

505.    As discussed in detail above, Princeton violated its duties and breached its express and implied agreements in, among other things, failing to adequately investigate Plaintiff's reports, unfairly discriminating against Plaintiff on the basis of his gender, erroneously finding Plaintiff responsible for sexual misconduct, and selectively enforcing its policies.

506.    As a result of the direct, proximate, and foreseeable consequences of Princeton's breaches, Plaintiff sustained substantial injury, damage, and loss, including, but not limited to, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

507.    Thus, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Breach of Implied Covenant of Good Faith and Fair Dealing
### (Against Princeton)

508.    Plaintiff John Doe repeats and re-alleges each and every allegation above as though fully set forth herein.

509.    At all relevant times herein, a contractual relationship existed between Plaintiff and Princeton, the terms of which were dictated, in part, by Princeton's RRR and the policies and procedures contained therein, including but not limited to the Policy.

510.    Through the documents it publishes and provides to students, Princeton makes express and implied contractual commitments to students in exchange for their enrollment and payment of relevant tuition and fees.

511.    Included in these contractual agreements is the covenant of good faith and fair

dealing implied in all contracts.  *See Palisades Properties, Inc. v. Brunetti*, 44 N.J. 117, 130 (1965).

512.    A party may be held liable for breach of the covenant of good faith and fair dealing even when there is no substantive breach of an express contractual term.  *See Hills v. Bank of Am.*, CIV.A. 13-4960 ES, 2015 WL 1205007, at *4 (D.N.J. Mar. 17, 2015) (citing *Wilson v. Amerada Hess Corp.*, 168 N.J. at 236, 236 (2001)); *Seidenberg v. Summit Bank*, 348 N.J. Super. 243, 257 (App. Div. 2002)).

513.    As set forth in detail above, Princeton violated the covenant of good faith and fair dealing by, among other things:

  a.   Intentionally permitting policy violations at the eating clubs, and specifically TI, to go unaddressed for decades;

  b.   Intentionally refusing to investigate Plaintiff's legitimate reports of numerous policy violations, including hazing, physical assault, sexual harassment, provision of alcohol to underage students, and excessive consumption of alcohol at TI;

  c.   Subjecting Plaintiff to a disciplinary process that was tainted from the start by virtue of simultaneous investigations and gender bias;

  d.   Ignoring/whitewashing blatant evidence of hazing at TI;

  e.   Ignoring/withholding blatant evidence of collusion and dishonesty by Smith and Roe;

  f.   Withholding witness identities that were known to Roe, but not Plaintiff; and

  g.   Rubber-stamping Plaintiff's appeal rather than conducting a substantive and genuine review.

514.    As a result of the direct, proximate, and foreseeable consequences of Princeton's

breaches, Plaintiff sustained substantial injury, damage, and loss, including, but not limited to, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

515.    Thus, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### Negligence
### (Against Minter, Crotty, Shueh, White)

516.    Plaintiff John Doe repeats and re-alleges each and every allegation above as though fully set forth herein.

517.    To state a negligence claim under New Jersey law, a plaintiff must show that the defendant owed the plaintiff a duty; that the defendant breached such a duty; and that the breach was the proximate cause of the injury.

518.    Here, the Defendants formed a university-student relationship with Plaintiff and, in light of their participation in the Title IX process and the express provisions of the RRR and the Policy, owed a duty to Plaintiff to conduct the disciplinary process with due care, to respond adequately to Plaintiff's reports of policy violations, including hazing, assault, and harassment, to perform investigations free from bias or conflict, to provide Plaintiff a genuine opportunity to defend himself, and to have proper training in investigating and evaluating the alleged conduct under Princeton's policies.

519.    In light of the individual Defendants' positions with Princeton, they had certain obligations with respect to the investigation and adjudication of Title IX complaints, including obligations owed to students, including Plaintiff, as to how they would treat students subject to a

disciplinary procedure and students who report policy violations.  By way of example and not limitation:

   a.  Defendant Minter was responsible for appointing the Title IX Panel to investigate Roe and Smith's claims against Plaintiff, and had a duty to appoint an unfair, unbiased, and appropriately trained Panel for each investigation, which she breached;

   b.  Defendant Crotty was responsible for investigating reported potential violations of the Policy and had a duty to initiate a Title IX investigation if such behavior, if substantiated, would constitute a violation of the Policy, which she breached; and

   c.  Defendants Shueh and White had a duty to conduct a full, fair, unbiased, and impartial investigation and adjudication of Title IX claims, which they breached.

520.   The foregoing duties were breached when Plaintiff did not receive the full protection of the RRR and the disciplinary process, and was subjected to a biased and prejudiced procedure, as described fully above.

521.   In light of the Defendants' deliberate, bad-faith failure to conduct a genuine investigation into Plaintiff's reports of hazing, assault, and harassment, despite a long, well-documented history of such behavior at the eating clubs, and TI in particular, Defendants' behavior was grossly negligent.

522.   Defendants' actions display a policy of harshly prosecuting and disciplining male respondents, rather than a genuine, unbiased search for the truth, constituting gross negligence in light of the severe and lasting harm resulting from their actions, including Plaintiff's two-year suspension and the marks on his disciplinary record and transcript.

523.   As a direct and Proximate result of Defendants' breach of their duties, Plaintiff

sustained substantial injury, damage, and loss, including, but not limited to, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

524.    Thus, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**AS AND FOR A NINTH CAUSE OF ACTION**
**Respondeat Superior**
**(Against Princeton)**

525.    Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

526.    As the employer for Defendants Minter, Crotty, Shueh, and White, Princeton is vicariously responsible for the negligent acts of its employees committed during the course of their employment.

527.    As detailed above, the enforcement of the RRR and the Policy, and the fair and impartial investigation and adjudication of student disciplinary matters are part of the regular employment duties of Defendants Minter, Crotty, Shueh, and White.

528.    As detailed above, Defendants Minter, Crotty, Shueh, and White breached their duty of care to Plaintiff in the course of their employment and ordinary duties at Princeton, specifically, with regard to their actions and inactions in selectively enforcing the Policy and subjecting Plaintiff to a biased, partial, defective, deficient, arbitrary and fundamentally unfair disciplinary process.

529.    As detailed above, the foreseeable, direct and proximate result of the individual defendants' grossly negligent and/or negligent behavior was that Plaintiff sustained substantial

114

injury, including, without limitation, loss of educational and career opportunities, reputational harm, economic injuries and other direct and consequential damages.

530.    As a result, Defendant Princeton University is liable to Plaintiff for the grossly negligent and/or negligent acts and omissions of Defendants Minter, Crotty, Shueh, and White under the principle of respondeat superior.

531.    Thus, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A TENTH CAUSE OF ACTION
### Breach of Contract/Implied Contract
### (Against TI)

532.    Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

533.    Tiger Inn is an organization that provides dining and social services to its members in exchange for an annual fee in the form of membership dues.

534.    By accepting Plaintiff as a TI member and initiating him into the eating club, TI created an express and/or implied contract with Plaintiff as a member.

535.    In addition to the provision of services in exchange for remuneration, TI makes certain promises to its members and expects certain promises in exchange.

536.    These promises are embodied in, among other things, certain publications disseminated by Tiger Inn and/or the ICC to TI members, including the eating club Statement of Principles.

537.    The Statement of Principles provides that:

    a.    "The Princeton Eating Clubs exist to provide a positive learning and social

115

environment in which members interact in a mutually respectful atmosphere that is consistent with the values represented by Princeton University."

b. "Members are expected to adhere to a Code of Conduct established by their club which requires they be respectful of the club, its property, its staff, its alumni members, its undergraduate members and the guests of any club member, and the University community in general."

c. "Each club shall adopt and maintain a Code of Conduct that is based upon applicable provisions of the University's most recent edition of [the RRR]."

d. "Sex and gender-based discrimination and sexual misconduct, including sexual harassment, (as defined under [the RRR]) are prohibited on or about all club premises."

e. "Members shall endeavor to ensure that the club maintains an atmosphere free of any pressures on other members, guests and employees relating to sexual misconduct."

f. "Each club shall adopt and implement policies that conform to University policy and state, county and local laws and ordinances related to the consumption and possession of alcohol."

g. "Participation by club members in any form of hazing (as defined in [the RRR] and by New Jersey law), and/or any initiation ritual that could be harmful, or result in injury to current prospective club members is prohibited, whether conducted on or off club premises. Initiation rituals that include the implicit or explicit requirement to ingest alcohol . . . ."

h. "Club members are admonished against organizing activities that encourage

116

excessive drinking, and/or which may create an environment in which non-drinkers may feel excluded and create an unsafe setting for those who are drinking."

538.   The Statement of Principles comprises express and/or implied agreements by TI to its members and initiates to create a safe, welcoming environment free from hazing, physical abuse, and sexual harassment.

539.   TI violated these express and implied agreements by failing to properly or genuinely implement safety protocols and by historically, consistently, and systematically permitting alcohol and hazing violations and sexual misconduct to go virtually unpunished.

540.   TI violated these express and implied agreements by permitting hazing at Plaintiff's initiation, including: provision of alcohol to underage students; encouragement of excessive drinking; degrading and dangerous behavior; physical assaults; sexual harassment in the form of flashing and directing new initiates to strip; and pressure to conform to sexual misconduct, including plying initiates with alcohol, telling them to strip, and repeatedly priming them to do whatever the upperclassmen say.

541.   As a direct and proximate result of these breaches, Plaintiff was physically assaulted, humiliated, and sexually harassed and assaulted by TI members.

542.   Thus, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### Negligence
### (Against TI)

543.   Plaintiff John Doe repeats and realleges each and every allegation above as

though fully set forth herein.

544.    Plaintiff, a Princeton student, was invited to "bicker" at TI, and was admitted to TI as a new member.

545.    The initiation night was organized and hosted by TI, on TI's premises, and Plaintiff was specifically invited (in fact, directed) to attend.

546.    TI thus owed Plaintiff a duty of care as a new initiate and an invitee of the club.

547.    TI breached its duty of care by providing the underaged Plaintiff with alcohol, pressuring him to drink excessively, and permitting him to be hazed and sexually harassed and assaulted by other members.

548.    Specifically, TI failed to enforce its own code of conduct, failed to enforce Princeton's RRR, and failed to enforce state and local laws regarding alcohol and hazing.

549.    As a direct and proximate result of TI's negligence, Plaintiff suffered humiliation and physical and emotional harm, including sexual assault.

550.    Thus, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.


## AS AND FOR A TWELFTH CAUSE OF ACTION
### Negligence – Negligent Security
### (Against TI)

551.    Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

552.    Tiger Inn owes its members and invited guests a reasonable duty of care to provide a safe environment for eating meals and socializing.

553.    This duty includes taking reasonable measures to prevent the reasonably

foreseeable acts of third parties.

554.    TI breached its duty of care to Plaintiff by failing to provide adequate security, in that Plaintiff was physically assaulted, sexually harassed, and coerced into leaving the club by an older TI member while he was intoxicated.

555.    The hazing activities to which Plaintiff was subjected were reasonably foreseeable, as TI was infamous for its hazing rituals, and TI officers planned, organized and ran the initiation events wherein the hazing (including the assaults) took place.

556.    As a direct and proximate result of TI's failure to provide adequate security measures, Plaintiff was pressured to binge drink alcohol despite being underaged, humiliated, assaulted, and harassed at TI by TI members and/or officers, resulting in both physical and emotional harm.

557.    Thus, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i)     On the First cause of action for Violation of Title IX of the Education Amendments of 1972 - erroneous outcome, a judgment against Princeton awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Princeton to: (i) reverse the findings and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his educational/academic/disciplinary file and/or transcript; (iv) permanently destroy any record of Jane Roe's complaint; (v) immediately reinstate Plaintiff as an enrolled student in good standing at Princeton; and (vi) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed;

(ii)    On the Second cause of action for Violation of Title IX of the Education Amendments of 1972 - selective enforcement, a judgment against Princeton awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Princeton to: (i) reverse the findings and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his educational/academic/disciplinary file and/or transcript; (iv) permanently destroy any record of Jane Roe's complaint; (v) immediately reinstate Plaintiff as an enrolled student in good standing at Princeton; and (vi) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed;

(iii)    On the Third cause of action for Violation of Title IX of the Education Amendments of 1972 - deliberate indifference, a judgment against Princeton awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Princeton to: (i) reverse the findings and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his educational/academic/disciplinary file and/or transcript; (iv) permanently destroy any record of Jane Roe's complaint; (v) immediately reinstate Plaintiff as an enrolled student in good standing at Princeton; (vi) conduct a genuine investigation into Plaintiff's claims of assault and harassment at TI; and (vii) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed;

(iv)    On the Fourth cause of action for Common-law Due Process/Fundamental Fairness, a judgment against Princeton awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Princeton to: (i) reverse the findings and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his educational/academic/disciplinary file and/or transcript; (iv) permanently destroy any record of Jane Roe's complaint; (v) immediately reinstate Plaintiff as an enrolled student in good standing at Princeton; (vi) conduct a genuine investigation into Plaintiff's claims of assault and harassment at TI; and (vii) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed;

(v)    On the Fifth cause of action for Breach of Contract, a judgment against Princeton awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)    On the Sixth cause of action for Breach of Implied/Quasi-Contract, a judgment against Princeton awarding Plaintiff damages in an amount to be determined at trial,

plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vii)   On the Seventh cause of action for Breach of the Implied Covenant of Good Faith and Fair Dealing, a judgment against Princeton awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(viii)  On the Eighth cause of action for Negligence, a judgment against Defendants Minter, Crotty, Shueh, and White, jointly and severally, in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ix)    On the Ninth cause of action for Respondeat Superior, a judgment against Princeton awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(x)     On the Tenth cause of action for breach of express and implied contract, a judgment against TI awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(xi)    On the Eleventh cause of action for negligence, a judgment against TI awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(xii)   On the Twelfth cause of action for negligence – negligent security, a judgment against TI awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(xiii)  Equitable relief in the form of an order directing Princeton to: (i) reverse the findings and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his educational/academic/disciplinary file and/or transcript; (iv) permanently destroy any record of Jane Roe's complaint; (v) immediately reinstate Plaintiff as an enrolled student in good standing at Princeton; (vi) conduct a genuine investigation into Plaintiff's claims of assault and harassment at TI; and (vii) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and

(xiv)   Such other, additional, and further relief as the Court deems just and proper.

## Jury Demand

Plaintiff herein demands a trial by a jury of all issues so triable in the present matter.

**Dated: May 16, 2019**

**Respectfully submitted,**

  /s/  Adrienne Levy, Esq.                                 
Adrienne Levy, Esq.
Diana R. Warshow, Esq.
Andrew T. Miltenberg, Esq.
(*Pro Hac Vice Admission Pending*)
NESENOFF & MILTENBERG, LLP
363 Seventh Avenue, Fifth Floor
New York, New York 10001
ALevy@nmllplaw.com
DWarshow@nmllplaw.com
AMiltenberg@nmllplaw.com

**ATTORNEYS FOR PLAINTIFF**